**FHR TB, LLC, et al., Plaintiffs,**

v.

**TB ISLE RESORT, LP., Defendant.**

**Case No. 11–23115–CIV.**

United States District Court,
S.D. Florida,
Miami Division.

Oct. 14, 2011.

Richard C. Hutchison, Holland & Knight LLP, Fort Lauderdale, FL, Michael Edward Hantman, Holland & Knight, Miami, FL, for Plaintiffs.

Dennis Alan Richard, Laurel White Marc–Charles, Michael Ryan Tolley, Richard & Richard, Miami, FL, James R. Butler, Jr., Jeffer Mangels Butler & Mitchell, LLP, Los Angeles, CA, Mark S. Adams, Jeffer Mangels Butler & Mitchell, LLP, Irvine, CA, for Defendant.

## *ORDER*

DONALD L. GRAHAM, District Judge.

**THIS CAUSE** comes before the Court upon Plaintiffs' Verified Motion for Preliminary Injunctive Relief [D.E. 9].

**THE MATTER** was referred to the Honorable United States Magistrate Judge Jonathan Goodman [D.E. 14]. After an evidentiary-hearing, the Magistrate Judge issued a Report and Recommendations (the "Report") [D.E. 51] recommending that Plaintiffs' motion be denied. Plaintiffs filed objections to the Report, and Defendant filed a response to Plaintiffs' objections. [*See* D.E. 54, 56.]

**THE COURT** has conducted an independent review of the record and is otherwise fully advised in the premises. Plaintiffs filed objections contending that the Report failed to consider the likelihood of success in arbitration, incorrectly applied agency principles, and generally disagreeing with the Report's conclusions. The

Court finds that Plaintiffs' have not met their burden of persuasion on each of the four requirements for a preliminary injunction. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that the Magistrate Judge's Report and Recommendation [D.E. 51] is **AFFIRMED, ADOPTED AND RATIFIED.** It is further

**ORDERED AND ADJUDGED** that Plaintiffs' Verified Motion for Preliminary Injunctive Relief [D.E. 9] is **DENIED.**

### REPORT AND RECOMMENDATIONS ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

JONATHAN GOODMAN, United States Magistrate Judge.

This Report and Recommendations concerns Plaintiffs' Motion for Preliminary Injunctive Relief (DE# 9), which United States District Judge Donald L. Graham referred to me (DE# 14) after United States District Judge Marcia Cooke, acting in Judge Graham's absence, denied (DE# 13) Plaintiff's request (DE# 10) for an emergency hearing. The Court has reviewed the motion, the Response, the Reply and supplemental memoranda. In addition, the Court held an all-day evidentiary hearing and reviewed post-hearing memoranda (in the form of proposed Reports and Recommendations).[1] For the reasons described below, the Undersigned respectfully recommends that the District Court **DENY** Plaintiffs' motion.

1. The Court commends all counsel for the quality of their memoranda and proposed Reports, especially given the deadline pressure under which they were prepared.

2. Defendant TB Isle Resort, LP is a Delaware limited partnership, with its principal place of business in Aventura, Florida. TB Isle Resort

### I. General Overview and Summary of the Factual Background

One of the Plaintiffs, FHR TB, LLC ("Fairmont"), manages hotels as the agent for the owners of the hotels. The other Plaintiff, Fairmont Hotels & Resorts (U.S.) Inc. ("FHRUSI"), owns Fairmont. Both Plaintiffs seek a preliminary injunction reinstating Fairmont as the manager of Defendant's hotel in Aventura, Florida. Defendant, TB Isle Resort, LP ("Turnberry") built and operated the hotel in the 1970s, later repurchasing it and contracting with Fairmont to manage it on a long-term basis, under a hotel management agreement ("HMA").

Until August 28, 2011, Fairmont operated and managed the Fairmont Turnberry Isle Resort and Club in Aventura, Florida, pursuant to the HMA. Defendant Turnberry owns the hotel. Jeffrey Soffer and Jacquelyn Soffer are, for all practical purposes, the principals of the Defendant.[2] The operating term of the HMA (entered into in 2006) is 25 years, with extensions for five additional consecutive 5–year terms if Fairmont is not in material default. Thus, Fairmont had, for all practical purposes, a 50–year HMA interest in operating and managing the luxury resort, consisting of a 392–room hotel, two golf courses, a spa and fitness center, a tennis facility, three swimming pools, several restaurants and other amenities.

Under the HMA's termination provisions, the Owner cannot contractually terminate the HMA without providing at least 30 days advance written notice which specifies the material defaults and provides an

GP, LLC, a Delaware LLC, is Defendant's general partner. When the HMA closed, the general partner's membership interests were assigned to TB Isle, LLC, a Florida LLC. Jeffrey and Jacquelyn Soffer are the members of this Florida LLC. The Court will refer to Defendant as "Turnberry" in this Report.

opportunity to cure. The Owner may then terminate the HMA (under paragraphs 16.2 and 16.3) if Fairmont fails to cure the material defaults specified in the written notice.

On the early morning of Sunday, August 28, 2011, Defendant Turnberry effectively evicted (i.e., ousted) Fairmont from the resort. Without advance notice of material defaults or an opportunity to cure the purported defaults, Turnberry engaged in what can fairly be described as a bold, surprise takeover. It demanded that senior hotel management appear at the hotel on short notice on a Sunday morning, informed them once they arrived that Turnberry was "debranding" the hotel and resort, and directed them to immediately leave the hotel property under the escort of an outside security team.[3]

Shortly after Turnberry removed Fairmont's senior on-site management, Fairmont received a letter from Turnberry, stating that Turnberry was unilaterally and immediately terminating the HMA. Turnberry further purported to notify Fairmont that it changed the branding of the hotel, from napkins to marquees, retained employees "loyal" to Turnberry, switched to a different room reservation system and website, and removed all references to the Fairmont name. Finally, the letter purported to bar Fairmont personnel from entering the Resort without prior permission.

Turnberry did not provided prior notice of a material default, did not advise Fairmont that Turnberry was considering termination of the HMA if material defaults were not cured and did not provide any specific grounds for termination other than a vague and conclusory reference, in the post-ouster letter, that Fairmont is "incapable of running the property to the standards we have expected, and in an efficient, profitable manner." The purported termination letter also contended that the hotel and resort "sustained millions of dollars in operational losses due to Fairmont Hotel's mismanagement and lack of marketing."

The letter also advised Fairmont that Turnberry was relying on New York law (which, under the HMA, is the governing law) and that under New York law a hotel owner always has the unrestricted **power** to revoke the operator's control. According to the letter, the HMA created only a **revocable** agency. In particular, the letter said, "we have terminated the HMA and have taken control of the hotel" and "we have exercised our absolute right and power to revoke the agency."

Although the letter contends that the resort suffered from millions of dollars of operational losses, other evidence (which the Court learned about at the hearing and through post-hearing submissions required by the Court) suggests that Fairmont's operations were not quite as unprofitable as Turnberry portrays. In fact, it turns out that Fairmont has earned significant *incentive fees* (which are a percentage of the gross operating profit) for the past several years. For example, Fairmont earned incentive fees (calculated as 7% of the Resort's gross operating profit) of $571,774 in 2010 and $577,875 in incentive fees through July 31, 2011.

---

**3.** The three terminated senior hotel management employees were technically *Turnberry* employees and received their salaries from Turnberry, not Fairmont. The parties do not dispute that the employees were (and presumably still are) loyal to Fairmont and effectively considered themselves to be Fairmont employees. However, it should be noted that at least some of these employees were simultaneously also direct employees of Fairmont (e.g., Alex Pratt, who also served as Fairmont's regional human resources director).

Having been ousted from the resort in an orchestrated plot to take over the hotel without compliance with the notice, cure and termination provisions of the HMA, Fairmont portrays Turnberry and the Soffers as hardball business partners who acted outrageously and in bad faith by intentionally scheming to engineer an unprecedented tactic in blatant violation of a comprehensive HMA which took months to negotiate.[4] Fairmont contends that Turnberry perpetrated what was essentially a business coup d'état and argues that a preliminary injunction is required to restore the status quo and to protect hotel management companies from being victimized by similar tactics.

According to Turnberry's own witnesses at the evidentiary hearing, Turnberry (i.e., the Soffers) had been planning this ouster for at least four months. At bottom, Turnberry's position appears to be one which recognizes its purposeful breach of the HMA's notice/cure/termination provisions but which relies on what it contends is its overriding legal *power* to terminate the HMA, subject to a claim for damages. Boiled down to a basic business philosophy, the business strategy of Turnberry and the Soffers in this case can fairly be described as follows: "Yes, we're violating the notice and cure provisions of HMA, but we have the power to do this whenever we want because the agency is revocable, so go ahead and sue us if you don't like it."

Given this scenario, Fairmont presents a compelling and sympathetic narrative about a wronged company which has been victimized by the resort owner and its principals.

But the Court's current task is not to determine whether Fairmont would prevail at an arbitration hearing and obtain a significant damages award.[5] Likewise, the Court's present duties under the referral of the preliminary injunction motion do not include a declaratory judgment about whether Turnberry breached the HMA's notice/cure/termination provisions. Instead, the Court's limited, current agenda is to determine whether to recommend the entry of a preliminary injunction which would oust Turnberry from its own property and reinstate Fairmont as the resort manager pending resolution of the arbitration.

Despite the business practices pursued by Turnberry and the Soffers in connection with the planned ouster in violation of the HMA, the Court is compelled to recommend **denial** of Fairmont's request for a preliminary injunction. The following reasons (which the Court will outline in greater detail later in this Report) generate the grounds for this recommendation:

First, it is far from clear that Fairmont is likely to prevail on the merits. The issue here is not whether Fairmont is likely to prevail on a breach of contract claim. Instead, the issue here is whether Fairmont is likely to prevail on its argument that its **agency relationship with Turnberry is** *irrevocable* **and capable of a** *specific performance* **order.**

Fairmont concedes that the general rule under New York law is that a principal always has the power to revoke an agency, subject to a damages claim. If this gener-

---

4. Defendant Turnberry has, for all practical purposes, admitted that its August 28, 2011 activities breached the HMA. At the hearing, its counsel readily conceded that Turnberry did not provide the requisite notice and "probably" violated the HMA's provisions for notice of breach and an opportunity to cure before terminating the contract. (Hr'g Tr., pp. 32–33, DE# 37).

5. The HMA contains arbitration provisions in Article XIX (Disputes) and Fairmont has already filed an arbitration demand.

al rule of law applies, then Fairmont would *not* have the right to demand reinstatement of the agency. Instead, it would have the right to pursue a claim for damages. Fairmont argues that two exceptions to the general rule render the agency irrevocable. But the facts do not clearly fit into the established exceptions. Fairmont conceivably *might* prevail on its agency argument under New York law, but this is insufficient to meet the requisite "likely to prevail" standard. The Court is not prepared on this limited record (with its accelerated briefing) to conclude that Fairmont is, in fact, *likely* to prevail on the revocable-irrevocable issue.

Second, Fairmont might be deemed to be seeking a *mandatory* injunction, which creates an even greater hurdle for the party seeking the extraordinary remedy of injunctive relief. Basically, Fairmont wants this Court to require Turnberry, the owner of the hotel/spa/resort, to be saddled with an entity it no longer wants as a business partner reinstated as manager and operator of the resort. The notion of requiring a property owner to be forcibly partnered with an operator it does not want to manage its property is inherently problematic and provides support for the general rule that a principal usually has the unrestricted power to revoke an agency. Fairmont classifies its requested injunction as a prohibitory one, while Turnberry describes it as a mandatory injunction. The answer is far from clear and the Court believes that a logical conclusion (on whether the requested injunction is mandatory or prohibitory) could be reached either way.

Third, and perhaps most importantly, Fairmont has not adequately demonstrated the requisite irreparable injury necessary for obtaining a preliminary injunction. Fairmont's fees (both the basic fee and the incentive fee) are objective amounts and Fairmont should be able to calculate lost profits in its breach of contract claim. Its arguments about being irrevocably damaged are not persuasive. The Turnberry resort is only one of 67 luxury resorts which Fairmont operates internationally. The loss of one hotel does not appear to be the type of damage which would be irreparable. Likewise, the claim that Fairmont would suffer incalculable loss of goodwill and damage to its reputation is speculative and vague. And Fairmont's argument that the entire luxury hotel industry would be turned on its head—with hotel owners "ripping up their HMAs" whenever they felt it was in their personal best interest— also seems to be a speculative and hyperbolic stretch. Therefore, Fairmont has not cleared the hurdle of demonstrating irreparable injury even if the agency were deemed irrevocable.

Fourth (and this relates to the "likely to prevail" issue), Fairmont's request for a preliminary injunction runs afoul of the legal principle (applicable in Florida, as well as in New York) that personal service contracts (which include agreements to provide business management services) are not enforceable by specific performance or injunction.

By way of an introductory summary, Fairmont may well be in a sympathetic position and Turnberry may well be wearing the hat of a business brawler who cares little for contractual obligations—but this scenario, while perhaps ammunition for Fairmont's damages claim, is inadequate to support a preliminary injunction reinstating a resort manager to run a property owned by a party who no longer wishes the manager to operate its property.

## II. *Detailed Factual Background*
### A. *Events Leading Up to Turnberry's Purchase of the Resort*

Fairmont is a Delaware limited liability company, having an office and place of

business at 155 Wellington Street West, Suite 3300, Toronto, Ontario M5V 0C3, Canada. The sole member of Fairmont is Fairmont Hotels & Resorts (U.S.) Inc., a Delaware corporation with its principal place of business in California.

FHRUSI, a privately held company, is a leading hotel management company, specializing in luxury hotel and resort properties for over 100 years with 67 properties worldwide. Since December 2005, FHRUSI's wholly-owned subsidiary, FHR TB LLC, has been the exclusive operator and manager of the Resort pursuant to an HMA with Turnberry, the owner of the Resort. FHRUSI is the guarantor of all FHR TB LLC's obligations under the HMA, executing an instrument incorporated into the HMA as such, and was bound by the HMA's noncompetition clause, Section 20.20. (HMA at p. 67). At the hearing, Turnberry emphasized that Fairmont and FHRUSI are separate entities and should be treated as such.

Turnberry is a Delaware Limited Partnership, with a principal place of business of c/o Turnberry Associates, 19501 Biscayne Boulevard, Suite 400, Aventura, Florida 33180. The general partner of Turnberry is TB Isle Resort GP, LLC, a Delaware LLC. When the HMA closed, the membership interests of the TB Isle Resort GP, LLC were assigned to TB Isle, LLC, a Florida LLC. The members of TB Isle, LLC, are Jeffrey Soffer and Jacquelyn Soffer.

The Resort consists of a 392–room hotel, two golf courses, a spa and fitness center, tennis facility, three swimming pools, several restaurants and additional amenities located in Aventura, Florida.

In 2005, Turnberry's principals, the Soffer family, wanted to purchase the Resort from its then owner (which is not involved in this litigation), but that prior owner, due to an acrimonious history with the Soffers, refused to negotiate with them. The Soffer family then approached Fairmont to facilitate the Soffers' re-purchase. At the Soffers' urging, Fairmont exercised its option and purchased the property, and then transferred the property to Turnberry in exchange for a long-term HMA and other valuable rights in the Resort. The transaction was negotiated over a period of six months, and through a complex series of transactions set forth in a December 2005 Purchase Agreement, FHRUSI entered into a purchase agreement with TCC, and then transferred its rights under the purchase agreement to entities that would ultimately be controlled by the Soffer family, which then acquired the Resort through Turnberry.[6]

On December 23, 2005, the sale transaction closed, effectuating Turnberry's acquisition of the Resort. As an express and essential condition of the closing, Turnberry executed the HMA and gave Fairmont other rights in the Resort pursuant to a separate Strategic Alliance Agreement ("SAA"). Both the SAA and the HMA are exhibits to the Purchase Agreement between FHRUSI and Turnberry, by which FHRUSI transferred to Turnberry its rights to purchase the Resort. (*See* Pl. Ex. 2, p. 2.) Fairmont emphasizes that the HMA and the SAA were entered into on the same day and contends that both agreements are part of the same transaction between the parties. Fairmont ar-

---

**6.** To effectuate the transaction, the Soffer family proposed a complex escrow transaction which involved a complicated series of transactions. FHRUSI assigned its option to a related company, which exercised it and entered into a purchase agreement with TCC. It then transferred its rights under the purchase agreement to entities that would ultimately be controlled by the Soffers, allowing Turnberry to acquire the Resort.

gues further that both were essential conditions of closing the Purchase Agreement.

Fairmont contends that it would not have acquired and transferred the Resort to Turnberry without receiving as consideration the long-term HMA and related agreements. As a result, it argues, Turnberry could not have acquired the Resort without executing the HMA and making the promises and agreements contained in that agreement. The bargain, according to Fairmont, was simple: Turnberry reacquired the Resort; in consideration, Fairmont received an exclusive right to operate and manage the Resort for up to 50 years, and other interests in the Resort itself—all in an effort to secure its continued presence in the strategically important South Florida luxury hotel market.

Fairmont contends that the parties understood that, although FHR TB LLC was the operator under the HMA, FHRUSI was in some practical respects the hotel manager because all notices under the HMA are to go to FHRUSI (Section 20.19, HMA) and because, as the HMA contemplates, the parent supplied the reservations systems, employee hiring software, proprietary information, and many other tools Fairmont used to perform the HMA. *See e.g.*, HMA § 8.2.

### *Fairmont's View: The HMA Contains*
### *Interests in the Resort Independent of the Right to Manage*

Fairmont argues that it has interests in the Resort that are independent of its right to operate the Resort, and independent of its role as agent of Turnberry in the operation of the Resort.

First, Fairmont notes that it has a right of quiet enjoyment. HMA § 12.1. The right of quiet enjoyment, according to Fairmont, is not a mere license to use the Resort; rather, it ensures Fairmont the right to "peaceful and quiet possession and enjoyment" of the Resort for the entire term of the HMA.

Second, Fairmont further stresses the fact that it negotiated for and obtained a right of first refusal to purchase the Resort. *Id.* at § 17.4(b). Fairmont says it considered this an important right because it secured Fairmont's rights to manage and remain in possession of the Resort in the future.

And, third, Fairmont points out that it negotiated for and obtained a similar, but independent right—the right of first offer for the Resort—being the right to acquire the Resort at an agreed price in the event Turnberry decides to sell the property. *Id.* at § 17.4(a). Rights of first offer and first refusal are not standard provisions in hotel management agreements.

In addition to the above interests identified in the HMA, Fairmont notes that it also bargained for and received equity rights in and approval rights over any future projects at the Resort pursuant to the SAA. First, any development that was to take place on the lands or to be associated with the Resort would be subject to Fairmont's approval. Second, to the extent that there was development on these lands, and the development was deemed by Fairmont to be consistent with Fairmont's operations and policies, Fairmont was offered the right to manage and brand such development as a part of the overall Resort. Third, Fairmont had the right to invest in any development project. The SAA was intended to ensure that Fairmont would brand and manage the entire Resort as it developed and grew. SAA, Sec. 2.2(a), 2.6.

### *The HMA's Termination Provisions*

Under the HMA, Fairmont was engaged "as the sole and exclusive operator of [the Resort] during the Operating Term" with "sole and exclusive control, discretion and

authority with respect to" the operation of the Resort. HMA § 3.1. The "Operating Term" is 25 years with five 5–year extensions as long as Fairmont is not in "Material Default," as defined in Section 16.2. *See Id.* at §§ 2.1, 2.2. Therefore, Fairmont was engaged to operate and manage the Resort for 50 years in total unless it was in Material Default.

The HMA, which is governed by New York law, specifies that the agreement may be terminated only in the event of a "Material Default" that is not cured, generally, within 30 days of notice of an alleged Material Default, as defined in Section 16.2. The parties negotiated several specific provisions barring termination of the HMA except in strict compliance with its terms:

- Owner knowingly and as a material element of the bargain waives any right or power otherwise available to terminate [the HMA] other than in strict accordance with its terms (Section 16.9(e)(3));
- The HMA shall be enforceable between the parties until the expiration of the operating term (including any extension terms that are exercised) subject only to the rights of early termination that are specifically provided in [the HMA] (Section 16.9(f)(4)).

And the parties agreed to other provisions concerning Turnberry's attempt to terminate the HMA:

- Any Court having jurisdiction over the parties to, or the subject matter of, [the HMA] may order the remedy of specific performance for the anticipatory or actual breach or the attempted or actual termination of [the HMA], notwithstanding any existence of an agency relationship between the Owner and Operator (Section 16.9(f)(2));
- The Owner specifically grants the Operator the right to seek and secure

injunctive relief without bond and specific performance of [the HMA], if the Owner should attempt a [sic] such a termination in breach (Section 16.9(e)(4));
- The Owner acknowledges that Operator would suffer damages to its brand and reputation in the event of a termination of [the HMA] by Owner in breach of [the HMA] and that damages on account of such harm would not be an adequate remedy (Section 16.9(e)(1)).

The parties also negotiated terms that concern the very argument Turnberry now makes, that the common law of agency permits it to unilaterally terminate the HMA despite conflicting contract terms:

- The character of Operator's interest in the Hotel (in terms of Operator's financial investments and interest in prospective financial achievement of the Hotel) is and shall be **deemed to be coupled with an interest** (Section 16.9(e)(2));
- If a conflict exists between the express terms and conditions of the HMA and the terms and conditions implied by the applicable law governing the relationship between a principal and agent, the express terms and conditions of [the HMA] shall govern and control (Section 16.9(f)(1));

Turnberry's representative separately initialed these provisions in Section 16.9, and all of the quoted provisions appear in all capital letters. *See* HMA, p. 51–52. The Turnberry representative initialing these provisions was Mario Romine, a lawyer.

The HMA also requires that any dispute, termination notice or other event entitling a party to terminate the HMA shall be submitted to arbitration. HMA §§ 16.4 and 19. In addition, Section 16.4

mandates that no attempted termination of the HMA will be effective until an arbitrator concludes that the **termination is effective under the HMA, and either party may seek an injunction** pending arbitration. *Id.* at §§ 16.4, 19.2(e)(i)(A).

### B. *The Sunday, August 28, 2011 Expulsion*

Early in the morning of Sunday, August 28, 2011, with no advance warning, notice, or opportunity to cure, Turnberry informed the Fairmont-trained senior hotel management personnel that they were terminated and must immediately leave the Resort.

Alex Pratt, Fairmont's regional director of human resources, testified that on that morning he saw an unfamiliar security guard with a gun in his holster. After going to his office he closed the door and began speaking on the phone with the hotel's general manager, David Feder, who had also been summoned to the hotel for an emergency meeting on short notice. At that point, Turnberry representatives, including Doug Hustad, knocked on his door. Hustad told Pratt that he was included in the senior executive-level changes and that he would be receiving two weeks of severance. Pratt then phoned Carolyn Clark, Fairmont's senior vice president of human resources.

After he told Ms. Clark that the owner announced it was debranding the hotel and was firing him, Hustad said, "we can do this the easy way or the hard way." Hustad then reached across the desk, put his hand on the phone Pratt was using and severed the phone connection. Pratt testified that he was angry, upset and "a little scared" because, in part, he had earlier seen a security guard with a gun. Turnberry denies that any guard it used that day had a gun and suggests that Pratt either mistook a radio or handcuffs on the guard's hip as a weapon. Pratt, on the other hand, testified that "[I] saw a pistol and I said, 'whoa.'" (Hr'g Tr., p. 203).

Later that morning, Fairmont was notified by letter from Turnberry that Turnberry was terminating the HMA. According to Fairmont, the letter failed to provide any proper basis under the HMA for Turnberry's attempted termination and ignored the fact that none of Turnberry's limited rights to terminate the HMA were triggered. HMA §§ 16.2, *et seq.* As outlined earlier in this Report, the letter also ignored Fairmont's 30-day period to cure any alleged material defaults provided for under the HMA. At the evidentiary hearing, Turnberry conceded that it never provided any formal, written notice of "mismanagement" or "lack of marketing" to Fairmont before the surprise ouster on the morning of Sunday, August 28, 2011. (Hr'g Tr., p. 33).

Turnberry's notification letter further indicated that Turnberry had disabled the existing hotel reservation system and website and removed all references to Fairmont, including the changing of all branding. Turnberry also informed Fairmont that it was prohibited from entering the Resort without Turnberry's prior express written permission. Later that day, a *Miami Herald* article noted that Fairmont was no longer managing the Resort. The article quoted Turnberry executive C. Scott Rohm, who stated that Fairmont would no longer be managing the Resort and that Turnberry would manage the Resort itself. The article repeated a quote from a Turnberry press release, as Rohm did not actually speak with any newspaper reporter.

The following morning at 4:34 a.m., Fairmont personnel who had arrived at the Resort post-ouster to investigate, including the chief operating officer of Fairmont's

parent (who is also president of Fairmont Hotels and Resorts), were notified by letter that they were not welcome on the Resort grounds and would be removed by 8 am.[7] In this second letter, which was delivered to Fairmont's president by both email and hand delivery to his Turnberry hotel room, Turnberry advised that he and the other Fairmont representatives would be deemed "trespassers" as of 8:00 a.m. and that they would be "escorted away" if they remained on the property past the morning deadline. The Fairmont executives left the hotel shortly after 8:00 a.m.

Following the ouster of Fairmont, Turnberry returned 11 boxes of documents to Fairmont and represented that it did not make copies of any documents in the 11 boxes and did not review any document for substance. Turnberry also advised the Court that it had not reviewed any of the information on the hard drive of Mr. Pratt's computer (which was left in his office). In addition, Turnberry advised that it packed up the hard drive and was prepared to immediately deliver it the day of the hearing because it was in the trunk of a car, ready to be turned over. Turnberry explained that it did not review Fairmont's proprietary information, and does not want to review this material, because Turnberry already has its own procedures it uses to manage several of its own hotels and that its other non-self managed hotel properties are managed by other companies, such as Marriott and Hyatt. (Hr'g Tr., p. 37).

## C. *The Present Litigation*

The day after being ousted, Fairmont filed this lawsuit. It filed its emergency verified motion for preliminary injunctive relief the day after that, along with its First Amended Complaint and a request for an emergency hearing. The district court denied the request for an emergency hearing, finding "there to be no emergency in the matter." (DE# 13). The district then court referred the motion for a preliminary injunction to the Undersigned, who scheduled an evidentiary hearing. The parties then submitted legal memoranda, followed by the evidentiary hearing.

Plaintiffs allege that Fairmont's contract to act as Turnberry's agent is irrevocable because the agency is coupled with an interest. (Am. Compl., ¶ 52(a), DE# 11, p. 10) ("... Fairmont has an agency coupled with an interest which prohibits Turnberry from revoking the agency at will ..."). Thus, Plaintiffs seek a preliminary injunction reinstating Fairmont as manager of Turnberry's hotel.

Fairmont contends that it has an interest in the Resort because, under the HMA, it has a right of first offer and a right of first refusal to purchase the Resort under the same terms and provisions as set forth in the offering notice to any other potential purchaser. HMA § 17.4. Therefore, Fairmont contends that, as a result of the transaction wherein Turnberry purchased the Resort and contracted with Fairmont, Fairmont has an agency coupled with an interest in the Resort and the HMA.

Turnberry admits that the relationship with Fairmont is one of agency, but denies that it is coupled with an interest. (Def's Answer, ¶ 52, DE# 17, p. 9). Turnberry contends that it had the right (i.e., the power) to revoke the agency at will, subject to Fairmont's claims against Turnberry for damages for breach of the HMA. (*Id.*)

Turnberry filed a declaratory judgment action against Fairmont in New York state

---

7. The Fairmont executives checked into the Turnberry hotel even though the letter sent earlier by email advised Fairmont's president that neither he nor any other agent or representative may enter the hotel without Turnberry's express prior written permission.

court on August 29, 2011 but advised at the evidentiary hearing that it has withdrawn that lawsuit.

### Plaintiffs' Motion for Preliminary Injunctive Relief

Plaintiffs argue that Fairmont's agency was coupled with an interest for four reasons.

First, Plaintiffs argue that because "[t]he HMA unequivocally provides that the agency is coupled with an interest," that the relationship should be so classified. (Pltfs' Mot., ¶ 36, DE# 9, p. 10). Turnberry responds that to be irrevocable, an agency must actually be coupled with an interest, not merely be described as irrevocable in the agency contract. (Def's Resp., DE# 20, p. 13).

Second, Plaintiffs argue that "[i]n addition Fairmont has an interest in the Resort because" in the event Turnberry decides to put it up for sale, Fairmont has a right of first offer and first refusal, rendering the agency irrevocable. (Pltfs' Mot., ¶ 37, DE# 9, p. 10). Turnberry responds that such rights are *contingent* on Turnberry deciding to sell the hotel—and are therefore not the vested property rights needed to render the agency irrevocable. (Def's Resp., DE# 20, p. 15).

Third, Plaintiffs argue that Fairmont's agency is coupled with an interest because execution of the HMA was a condition of a separate contract through which an affiliate of Fairmont—which is not a party to this case—sold the hotel to Turnberry. (Pltfs' Mot., ¶ 37, DE# 9, p. 10) ("... but for the agency and the authority Fairmont contracted for under the HMA, Turnberry would not have been able to buy the Resort from the seller"). Turnberry responds that neither Fairmont nor the nonparty seller or the other Plaintiff, FHRU-SI, have any property interest in the hotel; therefore, as a matter of law, the agency is not coupled with an interest and Turnberry had the right to revoke the agency at will subject only to Fairmont's claim for breach of contract claims. (Def's Resp., DE# 20, pp. 15–16).

Fourth, Plaintiffs argue that "Fairmont also has interests directly in the Resort—both a license to use the facilities and quiet enjoyment of the facilities of the Resort for the entire term of the HMA." (Pltfs' Mot., p. 10, ¶ 37, DE# 9, p. 10). Turnberry responds that these contract rights do not constitute interests in the property necessary to render the agency irrevocable, and that licenses are in any event also revocable at will. (Def's Resp., DE# 20, pp. 10–11).

In their reply memorandum in support of their motion, Plaintiffs raise an additional ground for their position that Fairmont's agency is irrevocable. Plaintiffs argue that in addition to being coupled with an interest, Fairmont's agency is supported by consideration: "First, there was consideration for this HMA ... Fairmont Gave Valuable Consideration for the HMA Making It Irrevocable." Plaintiffs argue that such consideration alone is sufficient to render the agency irrevocable. (Pltfs' Reply, pp. 1–2, DE# 24, p. 8–9). Turnberry responds that while an agency coupled with an interest must be given for consideration to be irrevocable, consideration *alone* is insufficient. In other words, Turnberry contends that Fairmont still must have an agency coupled with an interest in order to render the agency irrevocable.

The "Operating Term" of the HMA is 25 years. HMA § 2.1. In addition, the Operating Term is extended for "five (5) additional consecutive 5–year Extension Terms" upon the condition that Fairmont is not in "Material Default." *Id.* at 2.2. Therefore, Fairmont was engaged to oper-

ate and manage the Resort for 50 years unless Fairmont was in Material Default.

As described above, Section 16.12 provides certain conditions under which the HMA may be terminated. According to Fairmont, none of the HMA's termination provisions have been triggered. In fact, Turnberry does not allege any material breaches by Fairmont and has, for all practical purposes, not tried to claim that it complied with the termination provisions. Rather, Turnberry argues that it has the "power" to oust Fairmont even thought it might be exposed to liability and a damages award for breaching the HMA contract.

## PRIOR ARBITRATION

As outlined in Fairmont's Complaint, for more than three years after the signing of the HMA, Turnberry failed to make mandatory payments under the provisions of the HMA, the failure of which constituted a Material Default under Section 16.2 of the Agreement. Fairmont contends that Turnberry's failure to provide the necessary working capital funds, so that suppliers could be paid, significantly damaged the Resort and Fairmont's ability to manage it.

On February 15, 2008, having not received mandatory payments since early 2006, Fairmont requested in writing immediate payment of outstanding invoices issued to date. At Turnberry's subsequent request, Fairmont provided and continued to provide information, clarification, backup and support to each of Fairmont's fees and charges as invoiced under the HMA, and even met with Turnberry on several occasions to provide the requested information.

After an unsuccessful mediation proceeding, Fairmont demanded arbitration against Turnberry on or about March 12, 2009, pursuant to Article XIX of the HMA. In the arbitration, Fairmont sought to recover unpaid Incentive Fees, Centralized Service Fees (sales and marketing and technology and accounting) and Reimbursables due under the HMA in the total approximate amount of $6,069,173, calculated as of August 31, 2009, plus interest.

Turnberry answered and asserted counterclaims in excess of $30 million and sought declaratory relief, as amended, claiming Fairmont mismanaged and inadequately marketed the Resort.[8]

The arbitration was scheduled to take place over a three-week period, starting on Monday, September 14, 2009.

The parties engaged in discovery, with the arbitrator resolving disputes that arose, designated and exchanged voluminous exhibits for the hearing and expert reports and provided such exhibits and reports to the arbitrator. At approximately 4:00 pm on Friday, September 11, 2009, the last business day before the start of the scheduled three-week arbitral hearings, Turnberry advised by email and letter from its counsel that it did not intend to contest Fairmont's claim in the amount of $6,069,173 in the arbitration, that it sought to withdraw its counterclaims on a without prejudice basis and that it did not intend to appear and present witnesses at the final hearings scheduled to start on September 14, 2009.

Turnberry subsequently confirmed by email from its counsel that it would not appear at the scheduled final hearings and present witnesses. Based upon Turnber-

---

**8.** Although the current general manager of Turnberry's spa/resort testified at the evidentiary hearing that Turnberry "always" believed it had the power to terminate the HMA under New York principal-agent law, Turnberry did not try to unilaterally terminate the HMA agency or oust Fairmont from the hotel property during this earlier dispute.

ry's representations, including its representation that it would not contest Fairmont's claims and its acknowledgement that an award would be entered on these claims, Fairmont also agreed to cancel the scheduled hearings.

On October 16, 2009, the arbitrator made and entered a binding final award in writing (the "Award"). The Award required Turnberry to: (1) pay unpaid Centralized Services Fees and Reimbursable expenses totaling $5,352,837.00, due as of August 31, 2009; (2) pay the interest on the Centralized Services Fees and Reimbursable expenses, which as of October 8, 2009, was $505,499.00; (3) pay as of October 8, 2009, the total amount of money that Turnberry owes Fairmont which is $5,858,336.00 ($5,352,837.00 plus interest of $505,499.00); (4) pay interest on the outstanding balance of $5,858,336.00 from October 8, 2009, which is accruing at $765.00 per day; and (5) pay Incentive Fees in the amount of $716,336.00 which are owed and shall be paid in the future by Turnberry to Fairmont, with interest, in accordance with the parties' agreements, including the HMA.

On December 22, 2009, another district court judge in this district entered the Order Granting Petitioner's Motion to Confirm Arbitration Award and the Final Judgment. Turnberry eventually paid, other than certain deferred fees, the monies due pursuant to the Award.

At the evidentiary hearing, Fairmont advised that it had already filed its arbitration demand but took the position that the arbitration could only move forward if Fairmont were still operating the hotel. Fairmont also argues that an injunction reinstating its management team to operate the resort is necessary to preserve the arbitrator's ability to provide any meaningful relief.

In this lawsuit, Fairmont alleges that Turnberry acted in bad faith and breached the HMA in many ways:

a. Ignoring that the HMA provides that Fairmont has an agency coupled with an interest, which prohibits Turnberry from revoking the agency at will, Section 16.9(e) of the HMA;

b. Ignoring that any termination cannot be done on a non-business day, Section 20.7 of the HMA;

c. Failing to recognize that Fairmont is the sole and exclusive operator of the Resort and constantly and consistently interfering with Fairmont's operations and management, Section 3.1 of the HMA;

d. Failing to grant Fairmont the final decision on termination regarding executive positions at the Resort, Section 5.3 of the HMA;

e. Failing to respect Fairmont's right to possession of the real estate (Resort) and quiet enjoyment, Section 12.1 of the HMA,

f. Failing to abide by prohibitions on Turnberry interference with the Resort staff, Section 12.5 of the HMA;

g. Changing the Resort's name, Section 15.1 and 15.4 of the HMA;

h. Attempting to remove Fairmont without notice, thereby undermining Fairmont's ability to notify guests, vendors, tour operators, meeting planners, corporate clients, travel agencies and media in a manner to avoid or abate serious damage to the reputation, brand, and business opportunities of Fairmont, Section 15.10 of the HMA;

i. Failing to meet the minimum 30 days notice in the event of a Material Default and an opportunity to cure, Section 16.2 of the HMA; and

j. Failing to abide by the prohibition concerning only Material Defaults and the

Performance Test providing a basis for termination, Section 16.12 of the HMA.

### D. *The Evidentiary Hearing*

The Court held an all-day evidentiary hearing on the preliminary injunction motion on September 9, 2011. Six witnesses testified, including two expert witnesses.

Fairmont's executive vice-president of business strategy, Thomas Storey, testified about Fairmont's business: it is a global luxury hotel company with 67 properties in more than 20 countries, approximately 30,-000 employees and approximately 25,000 rooms. Story explained that Fairmont's business model is to enter into management contracts under which it manages luxury properties owned by third party owners. Only eighteen of the luxury hotels managed by Fairmont are in the United States, however.

In 2005, the Soffers approached Fairmont, which was already managing the resort and held an option to buy it, and expressed an interest in buying the property. Fairmont contacted the owner's advisors and learned that the owner refused to entertain a direct transaction with the Soffer entities because of prior, acrimonious dealings. Advised of this business roadblock, the Soffer entities proposed a structure where Fairmont would exercise its option, sell the property to a Soffer entity and then enter into a long-term HMA with a Soffer entity to manage the property. Storey explained that it took between three to six months to negotiate the purchase agreement and related transactions.

Storey testified that Fairmont would not have entered the purchase agreement with the Turnberry entities if Fairmont had not been awarded a long-term HMA, as well as the rights of quiet enjoyment and first-refusal discussed above

The Fairmont entity which had the option to purchase the property is not the same entity which entered into the HMA with Turnberry, however. Likewise, the Fairmont entity which sold the resort to Turnberry is not the same entity which entered into the HMA with Turnberry.

In addition to entering into an HMA, Fairmont also entered into a Strategic Alliance Agreement. The Strategic Alliance Agreement contained three significant rights, according to Storey's testimony: (1) the right to approve any redevelopment which was going to take place on property or associated with the resort, (2) the right to collect fees flowing from any redevelopment it approved, and (3) the right to invest almost 20% in the redevelopment. In the end, none of the opportunities contemplated by the Strategic Alliance Agreement ever came to pass.

Storey testified that Fairmont has been in business for approximately the past 100 years and the August 28, 2011 ouster at the Turnberry Hotel is the first time a resort owner has ousted Fairmont as the manager.

Fairmont's chief operating officer, Chris Cahill, also testified. Before August 28, 2011, Cahill explained, Fairmont had a workable and cooperative relationship with Turnberry. Cahill explained that Fairmont had managed the property without any confrontations and without any notice of concerns.[9]

9. Several days after the hearing, in response to a post-hearing Order, Turnberry submitted copies of letters and emails to and from Fairmont. Basically, these documents show that Turnberry raised questions about expenses and other management issues. At times, the emails suggest that Turnberry questioned some of Fairmont's decisions and took issue with some of those decisions or how they were carried out in practice. These written communications do not, however, appear to be unduly confrontational or strident and do

Cahill testified that Fairmont had booked more than 30,000 group rooms into the Turnberry resort property over the next 18 months. Cahill specifically mentioned MassMutual insurance company, which, according to Cahill, booked rooms because the property is (or was) a Fairmont property, not because it is Turnberry. Cahill said that MassMutual is upset because Fairmont left the property without first providing notice to MassMutual. He also testified that MassMutual is seeking compensation or help from Fairmont.

In addition to explaining about the MassMutual reaction, Cahill testified that Turnberry "hijacked" Fairmont's business and that he is losing the ability to control damage to the Fairmont brand.

Cahill explained that Fairmont has a team of 35 people ready to return to the resort and restore the property.

On cross-examination, Cahill testified that the HMA and the Fairmont brand are carried on the asset side of Fairmont's balance sheets. In addition, he also testified that values are assigned to the HMAs and to goodwill on the balance sheets.

Cahill also testified that Fairmont has, in large part, now notified guests and groups with reservations at the Turnberry Isle Hotel that Fairmont is no longer managing the property and is in a dispute with the owner.

Nevertheless, Cahill testified that he does not know how many group meeting planners, travel arrangers and intermedi-

aries will not book at a Fairmont because of the uncertainty caused by the ouster. By way of summary, he testified that Fairmont has "a cloud over out head until we can get this thing straightened out."

Fairmont also relied upon the expert witness testimony of Scott Berman, a partner and industry leader of the hospitality advisory practice at PriceWaterhouseCoopers in Miami. Before joining PWC, Berman was responsible for developing the Hilton brand in Latin America, the Caribbean, Mexico and Canada. While with Hilton, Berman negotiated HMAs. As a consultant for PriceWaterhouseCoopers, Berman provides advice to hotel industry clients, including advice concerning HMAs.

Berman explained that HMAs are the backbone of the luxury hotel business, providing reliability and certainty to the business relationship between hotel owners and the hotel operators they contract with for managing the properties.

Given the importance of HMAs to the industry, Berman explained, Turnberry's surprise ouster of Fairmont, which he described as "unprecedented," would "send an incredible ripple effect across the entire hotel industry" if Fairmont were not reinstated through a mandatory preliminary injunction. (Hr'g Tr., pg. 158, DE# 37). Phrased differently, Berman said that the ouster, if not corrected quickly through reinstatement of Fairmont as the operator, would create a scenario were "we could have all sorts of owners trying to—particu-

---

not seem atypical for communications between the owner and manager of a luxury resort generating millions of dollars per year in revenue. The communications do not invoke the termination provision and do not place Fairmont on notice that Turnberry considered Fairmont to be in material default.

Instead, a review of the emails shows complaints about a variety of largely *minor* issues. Many cannot be seriously construed as *com-*

*plaints* or notices of deficient performance or material default. Moreover, many are complaints which arguably are self-serving because they were lodged *after* April 2011, when Turnberry already decided it would terminate the HMA unilaterally. None of these emails rise to the level of Material Defaults under the HMA; none trigger any cure period, much less any of the HMA's termination provisions.

larly in a difficult economy—try to remove their operators." (*Id.*)

On cross-examination, Berman agreed that the parties are sophisticated and engaged in drawn-out negotiations before entering into the HMA. He also admitted he could not think of a luxury hotel operator which went out of business because it lost a single hotel.

Turnberry had its own expert witness, Tom Lattin, a Houston-based hospitality consultant who is also a visiting professor at the Conrad N. Hilton College at the University of Houston. Lattin has been in the hospitality industry for more than 40 years.

Lattin explained that hotel management companies like Fairmont typically do not own or lease the actual hotel properties because they prefer to take their revenues off the top line, without the risk and exposure of owning the hotel or resort. By not taking an ownership interest in the hotels they manage, hotel operators avoid the liability risk and the risk of future cash calls for additional money to keep a distressed property afloat.

On the flip side, as explained by Lattin, hotel management companies would obtain the benefit of having their HMAs irrevocable if they acquired an ownership interest in the hotels.

Lattin opined that Fairmont would not suffer irreparable damage if it was not quickly reinstated as manager of the Turnberry Isle Hotel. Other than loss in profit associated with the fees earned under the HMA, Fairmont would not sustain any other harm, according to Lattin.

In reaching this opinion of no irreparable damage, Lattin emphasized the fact that the Turnberry Isle Hotel represents only 1.5% of the hotels and resorts which Fairmont manages globally. Moreover, Lattin opined that the damages would be

quantifiable based on a measurable amount of lost fees. He also noted that hotel brands regularly lose hotels and still survive. For example, Lattin explained, Fairmont managed five hotels in the United States in 1988 and increased its portfolio to 18 hotels as of 2010. During that interval, Fairmont lost four flag hotels, all in 2005 and 2006. In 2006, after the loss of the four hotels, Fairmont went from 16 to 13 hotels but then increased to 18 hotels, a 38% increase.

Lattin also opined that a Fairmont guest *would* stay at other Fairmont hotels in the United States even though Fairmont lost its management at the Turnberry Isle Hotel. He said he finds no support for the contrary suggestion, which he said makes no sense.

Moreover, Lattin noted that Fairmont did not manage a luxury hotel or resort in Florida for 92 years (until 1993) yet it still managed to do well and increase its presence in the United States.

On cross-examination, Lattin said he had not reviewed the HMA involved in this case and has not analyzed the potential effect of a weekend or midnight takeover of a hotel by an owner and the effect on the industry.

He also acknowledged that he is not familiar with many other ouster-type scenarios.

Lattin opined that the Turnberry Isle Hotel ouster is unique. He explained that luxury hotel owners are usually not in the hotel business and therefore do not have the experience necessary to run a hotel. Turnberry, however, is a hotel operator and formerly operated the Resort itself as the Turnberry Isle Hotel. He also disagreed with Berman's opinion that the Turnberry Isle Hotel ouster would cause other luxury hotel owners to rip up their HMAs because they would likely be ex-

posed to millions of dollars in damages and because they would need to find another operator to manage the hotel, or that other operators would be reluctant to enter into an HMA with a hotel owner which just ousted the prior manager under a similar HMA.

Turnberry also elicited testimony from Scott Rohm, president of Turnberry Hotel Group. Rohm testified that that the owners lost more than $80 million in connection with the Turnberry Isle Hotel since 2006, under the Fairmont operation, and described the losses as "pretty devastating." (Hr'g Tr., p. 210). As it turns out, however, the majority of those losses flow from the owner's debt service, which exists *regardless* of the hotel's profitability. Moreover, Fairmont earned incentive fees for most of the years it has been operating the hotel under an HMA with Turnberry. The incentive fees are based on 7% of gross operating profit.

Rohm testified about myriad performance issues and claimed that there was "conflict" between Turnberry and Fairmont before he joined the company in February 2011. Rohm testified that the owner was concerned about lack of profitability, service delivery, basic general repair and maintenance, corporate billings and the comparatively poor performance under REVPAR (an index used in the industry to compare relative hotel financial results). He also explained that the owner found ways to improve the bottom line in the two weeks since the ouster.

Concerning the press release about the ouster, Rohm testified that the owner decided to not say anything derogative about Fairmont and has followed that policy.

Although Rohm testified that he and his staff arranged to collect and deliver Fairmont's proprietary materials, he explained that the customer lists and guest list belong to the owner.

Of the 125 conventions which were booked from the ouster until 2013, Rohm testified that only one group canceled after learning that the Turnberry Isle Hotel was no longer a Fairmont-managed property.

On cross-examination, Rohm testified that Turnberry first started to plan the August 28, 2011 weekend ouster of Fairmont in mid-April 2011. In response to a question from the Court, Rohm testified that Fairmont might have been able to cure the alleged grievances had Turnberry followed the contract terms and provided notice of material defaults and an opportunity to remedy the issues. (Hr'g Tr., p. 274).

### III. *Legal Analysis*

#### A. *General Principles*

The parties agree that the HMA and all matters arising under or relating to the HMA shall be governed and construed in accordance with the internal laws of the State of New York. (HMA, p. 59, § 20.3, Pltfs' Ex. 1; DE# 9–1, p. 15). While New York law applies to the terms of the HMA, federal procedural law governs the Court's interpretation and application of the injunction standards. *Ferrero v. Assoc. Materials Inc.*, 923 F.2d 1441, 1448 (11th Cir. 1991).

 Injunctive relief is an extraordinary remedy. *Café 207, Inc. v. St. Johns Cnty.*, 989 F.2d 1136, 1137 (11th Cir.1993). To succeed on its Motion, Fairmont must demonstrate by a preponderance of the evidence that it is likely to succeed on the merits of its claims; it will suffer irreparable harm in the absence of injunctive relief; the threatened injury outweighs any potential harm to Turnberry as a result of the injunction; and, the injunction will not be adverse to the public interest. *See Schiavo v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir.2005). If Fairmont fails to carry

its burden as to any one of the elements, the Court must deny the Motion. *Café 207, Inc.*, 989 F.2d at 1137. The decision to grant an injunction rests within the sound discretion of the district court and will not be disturbed absent abuse of discretion. *Haitian Refugee Ctr., Inc. v. Christopher*, 43 F.3d 1431, 1432 (11th Cir. 1995).

■ In the Eleventh Circuit, a preliminary injunction is an "extraordinary and drastic remedy, not to be granted unless the movant clearly established the 'burden of persuasion'" as to each of the four prerequisites. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir.2000).

■ Moreover, "the burden of persuasion in all of the four requirements is at all times upon the plaintiff." *Northeastern Florida Chapter v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) (reversing preliminary injunction because the plaintiff failed to carry its burden on one of the four prerequisites).

### B. *Is the Requested Injunction Mandatory or Prohibitive?*

■ When the moving party is seeking a *mandatory* injunction, it faces "a particularly heavy burden of persuasion...." *OM Group, Inc. v. Mooney*, No. 2:05CV546FTM33SPC, 2006 WL 68791, *8 (M.D.Fla. Jan. 11, 2006) (citing *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir.1958) (emphasis added)).

■ Under New York law, a *mandatory* injunction providing the ultimate relief sought in the case will ordinarily be de-

nied. *Tenzer v. Tucker*, 154 Misc.2d 468, 584 N.Y.S.2d 1006, 1008 (N.Y.1992):

A mandatory temporary injunction may not ordinarily be granted where the effect thereof is to grant the plaintiff the same relief which may ultimately be obtained after a trial on the merits.

■ Moreover, if the requested injunction is mandatory, then Fairmont's burden is elevated to making a "clear" showing on each of the four elements (instead of proceeding under a preponderance of the evidence standard). *In re WorldCom, Inc. Sec. Litig.*, 354 F.Supp.2d 455, 463 (S.D.N.Y.2005).

Because Turnberry *already* ousted Fairmont from the Resort and because Fairmont's requested relief would authorize Fairmont to return to the hotel property and would direct Turnberry to permit this reinstatement, the proposed preliminary injunction may be of the mandatory type, thereby triggering a heavier burden.

As expected, Turnberry argues for the heavier burden for a mandatory injunction, while Fairmont urges the traditional preponderance standard, based on its description of the requested injunction as merely prohibitive.

■ A preliminary injunction is typically prohibitive in nature if it seeks to maintain the status quo by prohibiting a party from taking certain action pending resolution of the case. *Haddad v. Arnold*, 784 F.Supp.2d 1284, 1295–96 (M.D.Fla.2010). But when the injunction would force a party to act, and not simply maintain the status quo, it becomes mandatory. *Id.*[10]

Turnberry contends that Fairmont is seeking a mandatory injunction requiring

---

**10.** While New York law applies to the terms of the HMA, federal law governs the Court's interpretation and application of the injunction standards. *Ferrero v. Assoc. Materials Inc.*, 923 F.2d 1441, 1448 (11th Cir.1991).

The Court has reviewed both federal and New York law and finds them in accord on all material legal issues involved in this recommendation.

that Turnberry take affirmative action to re-instate Fairmont as manager of the Resort. Fairmont seeks to be reinstated as the manager of the Resort, which would facially appear to require affirmative conduct and thus be mandatory in nature.

But Fairmont argues that the "present status of the parties ... is not always determinative of what the status quo is that should be maintained pending trial on the merits." *Salt Lake Tribune Publ'g Co., L.L.C. v. AT & T Corp.*, No. 2:00cv936C, 2001 WL 670928, at *3 (D.Utah Feb. 21, 2001), *rev'd on other grounds*, 320 F.3d 1081 (2003). Rather, the *status quo ante* to be achieved by injunctive relief is the position the parties held **at the time of the last uncontested act** between the parties. *See id.; see also Asa v. Pictometry Int'l. Corp.*, 757 F.Supp.2d 238, 243 (W.D.N.Y.2010) ("[T]he court's task when granting a preliminary injunction is generally to restore, and preserve, the *status quo ante, i.e.*, the situation that existed between the parties immediately prior to the events that precipitated the dispute.") (citations omitted).

As argued by Fairmont, the realities of the parties' relationship establish that the requested relief cannot realistically be categorized as a mandatory injunction because issuing the injunction will only preserve the *status quo ante* and merely prohibit Turnberry's unilateral termination of the HMA pending arbitration. *See also Salt Lake Tribune*, 2001 WL 670928, at *3 (concluding that allegedly breaching party's disputed action altered the status quo and reinstating the status quo in that situation did not constitute a mandatory injunction despite the fact that it would require affirmative action).

As a practical matter, however, the differing burdens are only academic issues here because, as outlined below, Fairmont would not be entitled to a preliminary injunction even under the non-heightened burden requiring proof of all four elements by a preponderance of the evidence.

## C. *Substantial Likelihood of Success on the Merits*

Before analyzing this important issue, the Court believes it makes sense to highlight the issues which are **not** applicable to this factor:

a. Whether Turnberry breached the notice/cure/termination provisions of the HMA (as the evidence overwhelmingly established and as Turnberry virtually conceded at the evidentiary hearing);

b. Whether Turnberry (and its principals) failed to act in good faith or affirmatively acted in bad faith;

c. Whether Turnberry and its counsel plotted for months to oust Fairmont from the Resort, regardless of Fairmont's level of performance, regardless of whether Fairmont was earning incentive fees based on gross operating profit and regardless of whether Fairmont could have cured any purported material defects;

d. Whether Turnberry's post-termination allegation of mismanagement against Fairmont is a manufactured, incorrect claim designed to provide purported support for a long-planned plot to evict Fairmont as the Resort's manager;

e. Whether Fairmont is estopped from challenging Turnberry's actions because it knew that the prior Resort owner had acrimonious relations with Turnberry's principals, the Soffers, yet knowingly decided to sell the property to a Soffer entity and enter into an HMA with an entity

they control;[11]

\* \* \* \* \* \* .

Instead, the issues are whether Fairmont's agency is coupled with an interest, whether consideration alone (in the absence of an interest) is sufficient to render the agency irrevocable and whether the requested injunction would be an impermissible order incorrectly seeking to enforce a personal services contract.

Among other theories, Fairmont focuses on the fact that the HMA specifically provides that the agency is one coupled with an interest and that a no-bond injunction may be sought. Fairmont also emphasizes myriad other interests it has in the property, underscores the fact that Turnberry's counsel specifically initialed the paragraph containing the "coupled with an interest" language and relies upon contractual language providing that the HMA supersedes any inconsistent rules in the common law of agency.

These arguments, while interesting and not facially illogical, are insufficient to establish that Fairmont's agency under the HMA is irrevocable.

### 1. General Rule on the Revocability of an Agency

███ "Ordinarily, an agency relationship is revocable at will by the princi-

pal. This principle of law is ancient and well-settled." *Ravallo v. Refridgerated Holdings, Inc.*, No. 08–cv–8207, 2009 WL 612490, at \*4 (S.D.N.Y. Feb. 25, 2009). "[T]he reason" for the rule is "that it is deemed contrary to public policy for a principal to have an agent forced upon him against his will." *Smith v. Conway*, 198 Misc. 886, 101 N.Y.S.2d 529, 531 (1950). Phrased differently but with the same policy considerations in mind, "courts wish to avoid the friction and social costs which result when the parties are reunited in a relationship that has already failed, especially where the services involve mutual confidence and the exercise of discretionary authority." *Woolley v. Embassy Suites, Inc.*, 227 Cal.App.3d 1520, 1534, 278 Cal.Rptr. 719 (1st Dist.1991).

██ However, if the principal revokes the agency in violation of the terms of the agency contract, the principal remains subject to the agent's claims for damages for a breach of contract. Therefore, the general rule is that the principal has the **power** to revoke the agency even if that revocation is wrong, even if it breaches the applicable contract and even if the revocation creates clear-cut liability for damages. As succinctly explained by one of the seminal New York cases:

**11.** In effect, this question flows from the proverb, "You've made your bed, now lie in it." This expression is commonly used as a response to people who have been complaining about problems they have brought on themselves. Basically, it means that a person "has made a decision and now must accept its consequences." http://dictionary.reference.com/browse/You've + made + your + bed + now + lie + in + it (last visited September 25, 2011).

This phrase "has been traced back to approximately 1590 and is related to the fifteenth century French proverb, 'comme on faict son lict, on le treuve' (as one makes one's bed, so one finds it). It was included in George Herbert's collection of proverbs in

1640 and in James Kelly's collection in 1721. It was first attested in the United States in 'Cy Whittaker's Place' by J.S. Lincoln, and is found in varying forms ..." http:www.phrases.org.uk/bulletin_board/62/messages/313.html (last visited September 26, 2011), quoting *Random House Dictionary of Popular Proverbs and Sayings, by Gregory Y. Titelman.*

The parties did not expressly invoke the notion that Fairmont should have been on notice that Turnberry or its principals might be difficult business partners because the Resort's prior owner refused to negotiate directly with Turnberry's principals, but Fairmont discussed this history in memoranda and its proposed Report, and it described that prior relationship as "acrimonious."

At the outset we should sharply distinguish between the parties' powers, rights and duties arising under the contract itself, and those arising under the agency relationship created by the contract. It is well settled that, with but a few exceptions ... a principal has the power to revoke at any time his agent's authority to represent him. This is not to say, however, that in doing so he is immune from liability to the agent for breach of contract....

Thus, while defendant had the power to terminate at will its agency relationship with plaintiff, if in so doing it violated its obligations under the contract, it must respond to plaintiff in damages....

*Wilson Sullivan Co., Inc. v. International Paper Makers Realty Corp.*, 119 N.E.2d 573, 574, 307 N.Y. 20, 23 (1954). Although Wilson Sullivan was decided more than 50 years ago, it is still good law. *See, e.g., G.K. Alan Assoc., Inc. v. Lazzari*, 44 A.D.3d 95, 840 N.Y.S.2d 378, 385 (N.Y.App.Div.2007) ("a principal is always free to terminate the agency relationship, subject to a claim for damages by the agent....").

Significantly, this basic well-established rule of agency law has been recognized in New York **in the context of a hotel management agreement:**

[W]hen a hotel owner enters into a management agreement by which it divests itself of day-to-day control of the hotel's operation but retains ownership ... the owner retains the right to revoke the managing agent's control.

*P.L. Diamond LLC v. Becker–Paramount LLC*, 16 Misc.3d 1105(A), 841 N.Y.S.2d 828 (N.Y.Sup.Ct.2007), 2007 N.Y. Slip Op. 51298, *9.

The New York Court of Appeals' sharp distinction between a principal's **power** to revoke an agency outside the terms of the contract and the principal's **rights** under the contract has been echoed in California, which follows the same law. *Compare Wilson Sullivan Co.*, 307 N.Y. at 23, 119 N.E.2d 573, *with Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Inc.*, 19 Cal. App.4th 615, 626, 23 Cal.Rptr.2d 555 (Cal. Ct.App.1993):

There is a distinction between the *power* to revoke and the *right* to revoke an agency. Except where the agent's power is coupled with an interest, the power to revoke always exists, but the right to revoke without liability for damages depends upon circumstances. If the right does not exist, the principal will be liable for damages upon a revocation.

While the circumstances and intent of parties to a contract may be relevant to whether there is a contractual right to revoke an agency, they are not relevant to the existence of the power to revoke.

(emphasis in original; internal quotation marks and notations omitted).

In the hotel management contract context, courts have enforced this basic law and classified agency relationships as revocable **even where the HMA or similar contract expressly provided to the contrary.** More on this shortly, when the Court analyzes Fairmont's first theory for the position that the HMA here is not subject to the general rule of revocability.

**2. Exception to the General Rule**

█ One exception to the rule that a principal may terminate its agent at will, subject to the agent's claims for damages, is when the agency is coupled with an interest in the subject of the agency. In order to fall within this "agency-is-irrevocable" exception, however, the interest must be "in the subject of the agency itself, and not a mere interest in the execution of the authority." *Peter Lampack Agency, Inc. v. Grimes*, 29 Misc.3d 1208(A)

at *4 (internal quotation marks and ellipsis omitted).

The reason for the exception is that when an agent has its own interest in the subject matter of the agency, the agent's work is, in part, to protect its *own* interest in the property it is managing—which means the agency is not only for the benefit of the principal, but also for the agent. *Ravallo v. Refridgerated Holdings, Inc.,* No. 08–cv–8207, 2009 WL 612490, at *4 (S.D.N.Y. Feb. 25, 2009). In the instant case, the HMA explicitly provides that Fairmont is acting solely on behalf of Turnberry and **not on its own behalf.** HMA, § 3.3 (DE# 9, p. 35) ("In the performance of its duties as operator of the Hotel pursuant to this Agreement ... [Fairmont] shall act solely on behalf of for [Turnberry] and not on its own behalf.").

■ The first basis offered by Plaintiffs for their position that Fairmont's agency is coupled with an interest—that the HMA says it is—is insufficient. Both case law and the Restatement (Third) of Agency explain this point:

> Words alone are not enough to establish an agency coupled with an interest.... The mere fact that the commission provision "appoints [agent] irrevocably" as an agent is not enough to create an agency coupled with an interest. (*In re Jarmakowski's Estate,* 8 N.Y.S.2d at 38 (N.Y.Sur.1938) ["there must be more than mere words to establish an agency coupled with an interest"]).... Since [agent] does not have a property interest in [the subject of the agency], its agency is revocable and it was revoked....

*Peter Lampack Agency, Inc. v. Grimes,* 29 Misc.3d 1208(A), 2010 WL 3960602 (N.Y.Sup.Ct.2010), 2010 N.Y. Slip Op. 51749(U), at *4. *See also In re Jarmakowski's Estate,* 169 Misc. 463, 465, 8 N.Y.S.2d 35 (N.Y.Sur.1938) ("the words 'the intention hereof being to create an agency coupled with an interest' do not mean that it is an agency coupled with an interest. There must be more than mere words to establish this."); Restatement (Third) Of Agency § 3.10 (2006), Comment (b) ("A principal has power to revoke an agent's actual authority and the agent has power to renounce it. The power is not extinguished because an agreement between principal and agent states that the agent's actual authority shall be irrevocable or shall not be revoked except under specified circumstances ... Exercising the power to revoke or renounce may constitute a breach of contract."); *Pacific Landmark Hotel,* 19 Cal.App.4th at 626, 23 Cal. Rptr.2d 555:

> Even if a hotel management contract did attempt to restrict the power of the owner to terminate the manager, such provision would be ineffective, unless the agency were coupled with an interest, because the principal's power of revocation is absolute and applies even if doing so is a violation of the contract or the agency is characterized as "irrevocable." Thus, even if the parties intend to create an irrevocable agency, one coupled with an interest, unless they do so and such an interest does in fact exist, the statutory power to revoke may be exercised. If the exercise of the statutory revocation power is contractually unjustified, damages may be in order.

(internal quotation marks and citations omitted); *id.* (California has "codified ... this well-established rule that unless the power of an agent is coupled with an interest in the subject of the agency, the principal has the power to revoke the agency.").

The second basis argued by Plaintiffs for the argument that Fairmont's agency is coupled with an interest (and therefore irrevocable) is that Fairmont's rights of first offer and first refusal constitute a

"present" and "vested" "real property interest." However, in support Plaintiffs cite *Morrison v. Piper*, 77 N.Y.2d 165, 565 N.Y.S.2d 444, 566 N.E.2d 643, 645 (1990), which actually holds that a right of first refusal, like an option, is *not* a vested interest, and that it does not even ripen into an option until "the happening of a contingency...." *Id.*, 565 N.Y.S.2d 444, 566 N.E.2d at 646. *See also Space Imaging Europe, Ltd. v. Space Imaging L.P.*, 38 F.Supp.2d 326, 334 (S.D.N.Y.1999) (observing that a right of first refusal was " 'a contingency' " under New York law).

In order to render an agency irrevocable, the agent's interest in the property must be "**vested**," not contingent. *In re Jarmakowski's Estate*, 8 N.Y.S.2d at 38, 169 Misc. at 466:

> It is well settled that to create such an agency or power of attorney, that is, one which will survive the death of the principal or grantor of the power, the agency or power must be coupled with an interest. It must be coupled with a *vested* interest in the subject matter.

(emphasis added). *See also* 4B N.Y. Prac. § 77:20 Termination of Agency—Irrevocable Agencies (3d ed. 2010) ("The agent must have *immediately vested* rights in the property for the agency to be irrevocable.") (emphasis added); *see also Woolley*, 227 Cal.App.3d at 1532, 278 Cal.Rptr. 719 ("For an agency to be coupled with an interest the agent must have a 'specific, present and coexisting' beneficial interest in the subject matter of the agency.").

For the same reasons, Plaintiffs' third argument—that by virtue of a Strategic Alliance Agreement between Fairmont, Turnberry and a Turnberry affiliate, Fairmont has "equity rights" in possible future developments—is insufficient. As Plaintiffs' executive vice president, Mr. Storey, testified, the Strategic Alliance Agreement related to opportunities that **never came to pass.** (Hr'g Tr. 76:14–77:9).

In the same vein, Plaintiffs argue that Fairmont's contractual right of possession and quiet enjoyment of the hotel during its management term is a "grant" that "gave Fairmont an 'estate for years' under the law of real property." (Pltfs' Reply, pp. 5–6, DE# 24, pp. 12–13). In both their Reply and proposed Report and Recommendation (DE# 48, p. 21–22), Plaintiffs cite Florida Jurisprudence for the proposition that "[t]he term of the estate for years granted is '**an interest in the land; it constitutes a proprietary interest in the land.**' 34 Fla. Jur. 2d. Landlord and Tenant, § 11 (2011)." However, Florida Jurisprudence explains that "a valid **lease** of land for a term of years is a conveyance of an interest in the land; it constitutes a proprietary interest in the land." 34 Fla. Jur. 2d. Landlord and Tenant § 11 (2011) (emphasis supplied). Fairmont concedes that it does not have a lease interest in the Resort property, however—a critical omission.

Plaintiffs argued that Fairmont's contract rights to quiet enjoyment and use of the hotel facilities during the term of the HMA is "a license." However, a license, like an agency relationship, may be **revoked at will** under New York law. *Simmons v. Abbondandolo*, 184 A.D.2d 878, 585 N.Y.S.2d 535, 536 (1992) ("Inasmuch as a license may be revoked at will, Supreme Court properly denied plaintiff injunctive relief and left the issue of plaintiff's entitlement to money damages to be resolved at trial.") (citations omitted).

Plaintiffs advance another argument for their position that Fairmont's agency is coupled with an interest: that the execution of the HMA was a condition of the sale of the hotel to Turnberry. However, neither of the Plaintiffs, Fairmont or FHRUSI, have any ownership interest in

the hotel. As Plaintiffs allege in their Amended Complaint, the hotel is owned by Turnberry. (Pltfs' Am. Compl. ¶ 1, DE# 11, p. 1). Turnberry admits this allegation in its Answer. (Def. Ans., ¶ 1, DE# 17, p. 1).

Plaintiffs have not cited a case which supports the conclusion that an HMA agency is irrevocable merely because the HMA was a condition of the sale to the Owner.

Fairmont argues that it previously had an option to purchase the hotel. However, the entity that had that option was not Fairmont but FHRUSI, the entity that owns Fairmont. (See Purchase Agreement, Pltfs' Ex. 4, p. 1, DE# 27–6). Moreover, it was not FHRUSI that sold the hotel to Turnberry. The actual seller was TB Isle Holdings, LLC, a Florida limited liability company that, while then owned by FHRUSI, is not a party to this action. Id. In addition, although the Purchase Agreement provided for FHRUSI to receive an HMA, the HMA was actually entered into between Turnberry and Fairmont.

Even if a Fairmont *affiliate*, such as FHRUSI, had a present vested interest in the hotel, that interest would not make *Fairmont's* agency irrevocable. The existence of separate entities is legally significant, as evident from *Pacific Landmark Hotel*, 19 Cal.App.4th at 626, 23 Cal. Rptr.2d 555. In that case, the hotel management agreements were between the hotel owners and Marriott Hotels, Inc. ("MHI") as manager. At the same time the management agreements were entered into, an MHI *subsidiary* purchased a 5% ownership interest in the hotel. Id. at 618–620, 23 Cal.Rptr.2d 555. The issue in *Marriott* was the same issue as we have here: "whether or not the Management Agreements created an agency coupled with an interest or merely created an

agency terminable at will." Id. at 621, 23 Cal.Rptr.2d 555.

The trial court ruled that the agency was coupled with an interest and could not be terminated except under the express provisions of the hotel management agreements because the MHI affiliate held a 5% ownership interest. Id. at 621–624, 23 Cal. Rptr.2d 555. On appeal, however, this ruling was reversed because the ownership interest held by the MHI affiliate was not an interest held by the agent, MHI. "The power and the interest" must be "united in the same person." Id. at 624, 23 Cal. Rptr.2d 555 (*quoting Hunt v. Rousmanier*, 21 U.S. (8 Wheat.) 174, 203, 5 L.Ed. 589 (1823)). The agent, MHI, "was not given any interest in the Hotel. . . ." Id. at 627, 23 Cal.Rptr.2d 555.

It is the "agent" who must receive "title to all or part of the subject matter of the agency" in order for the agency to be coupled with an interest. *Peter Lampack Agency, Inc. v. Grimes*, 29 Misc.3d 1208(A), 2010 WL 3960602 (N.Y.2010), 2010 N.Y. Slip Op. 51749(U), at *4 ("An agency is coupled with an interest where, as part of the arrangement with the principal, *the agent* receives title to all or part of the subject matter of the agency.") (emphasis added); *see also Ravallo v. Refridgerated Holdings, Inc.*, No. 08–cv–8207, 2009 WL 612490, at *4 (S.D.N.Y. Feb. 25, 2009) (citing *Hunt* for proposition that agency is irrevocable unless coupled with an interest); *Hunt*, 21 U.S. at 204 ("The power and the interest are united in the same person.").

Fairmont's argument glosses over the significant point that the separate entity status of principals and agents and their affiliates matters. *See e.g. G.K. Alan Assoc.*, 840 N.Y.S.2d at 384 ("A corporation and its shareholders are separate legal persons . . . Therefore, the agent of a cor-

porate principal is not, merely by virtue of the agency relationship with the corporation, an agent of a shareholder of the corporate principal.").

The HMA here is between two entities, Fairmont and Turnberry. The HMA has an entire agreement clause. HMA p. 62 (DE# 9–1, p. 19) ("No Party shall be bound by any representations, warranties, promises, agreements or inducements not embodied herein, and no warranties of any Party not expressed herein are to be implied."). New York courts "strictly enforce" such clauses. *Montefiore Med. Ctr. v. Crest Plaza LLC*, 889 N.Y.S.2d 506, 24 Misc.3d 1201(A), at *12 (N.Y.App.2009); *Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665, 722 N.Y.S.2d 784, 745 N.E.2d 1006, 1009 (N.Y.App.2001) (purpose of clause is "to bar ... extrinsic evidence to alter, vary or contradict the terms of the writing." Merger clause accomplishes this "by evincing the parties' intent that the agreement 'is to be considered a completely integrated writing.'") (citation omitted).

The hotel management agreements in *Pacific Landmark Hotel* also "provided they were the entire agreements between" MHI and the owners. 19 Cal.App.4th at 627, 23 Cal.Rptr.2d 555. But the court found dispositive the fact that, even though a Marriott subsidiary had loaned the owner $8 million in capital and purchased a 5% ownership position in the entities that owned the hotels, that interest was not held by Marriott, the agent operating the hotel. *Id.* at 620, 624–625, 23 Cal.Rptr.2d 555.

Indeed, Plaintiffs have themselves recognized their status as separate entities. FHRUSI has sued Turnberry seeking monetary damages for the benefit conferred on Turnberry by FHRUSI "agreeing to assign to Turnberry its right to purchase the Resort in exchange for the long-term HMA pertaining to the Resort." (Pltfs' Am. Compl., Count VII, DE# 11, p. 16, ¶ 90 ("In 2005, [FHRUSI] owned the right to purchase the Resort"), at ¶ 91 ("[FHRUSI] conferred a benefit on Turnberry by agreeing to assign to Turnberry its right to purchase the Resort in exchange for the long-term HMA pertaining to the Resort"), at ¶ 93 ("Turnberry accepted or retained the benefit and was enriched at [FHRUSI's] expense"); WHEREFORE clause following ¶ 93 ("[FHRUSI] demands judgment against Turnberry for compensatory money damages....")). Fairmont, however, is not a party to this count.

Similarly, Fairmont, not FHRUSI, is the only party Plaintiff to the claim against Turnberry for breach of the HMA contract. (Pltfs' Am. Compl., Count I, DE# 11, pp. 9–11). In that count, Fairmont (not FHRUSI) seeks, *inter alia*, monetary damages for Turnberry's alleged breach of the HMA "including but not limited to liquidated and unliquidated, consequential, special, out-of-pocket, lost profits and damages to reputation and good will, due to Turnberry's unlawful and improper actions...." (Am. Compl., p. 11, DE# 11).

Thus, in this case, the agency relationship is not coupled with the interest required to make it irrevocable, and, as a matter of law, may be revoked at the will of the principal subject, of course, to Fairmont's remedies for damages.[12]

---

**12.** Fairmont *could have* bargained for an interest in the subject of the agency. When Turnberry acquired the hotel, it invested at least $240 million, $140 million for the purchase price and more than $100 million for renovation. (Purchase Agreement, 4th "Whereas" paragraph, DE# 27–6, p. 2; Hr' Tr. 296:11–19). Assuming Fairmont could have purchased 10% of the equity, that would have required an investment of more than

Other than submitting as supplemental authority a brief, analysis-free trial court temporary restraining order which preserved the status quo for a week, Fairmont did not call the Court's attention to any case **in the hotel management context** where the operator was reinstated through injunctive relief or where the hotel owner was enjoined from revoking the agency. This is not a mere coincidence. On the other hand, Turnberry cited several hotel management cases supporting its position that the agency is revocable, even if the HMA or other governing contract provides to the contrary.

### Is Consideration Alone Sufficient to Render an Agency Irrevocable?

Plaintiffs contend there is another exception to the general rule that the principal may revoke the agency at will: where consideration for the HMA was provided. But it is clear that Plaintiffs are incorrectly mingling two separate principles.

Consideration is necessary to make an agency irrevocable, but an agency coupled with an interest must *still* be present for consideration to render the agency irrevocable. Under New York law, "[c]onsideration is not essential" for an agency; "[g]ratuitous agencies are not uncommon." 4B N.Y. Prac. § 77:11 Prerequisites to Creation or Existence of Agency—Consideration (3d ed. 2010). *See also* 4B N.Y. Prac. § 77:20 Termination of Agency—Irrevocable Agencies (3d ed. 2010) (emphasis added):

> Under certain circumstances, an agency is irrevocable and, consequently, not terminable by the parties or operation of law. An agency is irrevocable if the agency agreement grants the agent a present right or interest in property which is the subject of the agency **and** the agency is supported by consideration.
>
> The agent must have **immediately vested** rights in the property for the agency to be irrevocable.

This is reflected in several New York cases. *See e.g. Hoffman v. Union Dime Sav. Inst.*, 95 N.Y.S. 1045, 109 A.D. 24, 26 (1905):

> The rule is well settled that, in order that a power of attorney shall survive the death of the principal, it must be given on consideration, **and** there must be vested in the donee some estate, right, or interest in its subject-matter.

(emphasis added); *French v. Kensico Cemetery*, 264 A.D. 617, 35 N.Y.S.2d 826, 828 (1942):

> Our conclusion is that the delivery of the money and the giving of the receipt constituted an agreement which created an agency (or a power) coupled with an interest in defendant, **and** that if the agreement was founded on a sufficient consideration, it is irrevocable by plaintiff.

(emphasis added); *U.S. v. Shaprow*, No. Civ–78–260, 1979 WL 1464, at *4 (W.D.N.Y. Sept. 10, 1979) (power not revocable "unless the power is coupled with an interest in the subject matter **and** given for consideration.") (emphasis added). *See also In re Jarmakowsi's Estate*, 8 N.Y.S.2d at 38:

> It is well settled that to create such an agency or power of attorney, that is, one which will survive the death of the principal or grantor of the power, the agency or power must be coupled with an interest. *It must be coupled with a vested*

---

$24 million. However, as Fairmont's chief operating officer, Mr. Cahill, testified, Fairmont's "business model ... is that we are a manager and not a owner of hotels," that as a manager Fairmont takes a revenue percentage of the gross revenue received by the hotel, and Fairmont does "not share in the losses." (Hr'g Tr. 118:12–119:2).

*interest in the subject matter. The agency or power must be given on consideration.*

(emphasis added, citations omitted).

The authority upon which Plaintiffs rely for the proposition that consideration alone is enough to make an agency irrevocable by the principal is not persuasive.

In *Terwilliger v. Ontario, C & S.R. Co.,* 149 N.Y. 86, 96, 43 N.E. 432 (1896), the court held only that the agent had an interest in the subject matter of the agency, and it was that interest that rendered the agency irrevocable. Specifically, two men had adjoining farms. One mistakenly harvested and sold timber from his neighbor's farm. He thereafter authorized his neighbor to take timber which had been cut into railroad ties) from his land and sell them to recover the value of the timber he had mistakenly taken from his neighbor's land. This authority was irrevocable because the neighbor had an interest in the subject of the agency—the railroad ties—the sale of which would pay for what was wrongfully taken from his land. *Terwilliger,* 149 N.Y. at 86–93, 43 N.E. 432. The agent was not being paid a fee to sell the railroad ties. *Id. See also* 4B N.Y. Prac. § 77:20. Termination of Agency—Irrevocable Agencies ("The agent must have immediately vested rights in the property for the agency to be irrevocable. This is commonly accomplished by giving the agent a security interest in the property.").

The *Terwilliger* court observed that the agreement itself must be based on sufficient consideration, but to be irrevocable, the authority must be coupled with an interest:

> The result seems to be that where an agreement is entered into on a sufficient consideration, whereby an authority is given for the purpose of securing some benefit to the donee of the authority,

such an authority is irrevocable. This is what is usually meant by an authority coupled with an interest.

*Id.* at 94, 43 N.E. 432 (internal quotations omitted).

Fairmont also relies upon *Ravallo v. Refridgerated Holdings, Inc.,* No. 08–cv–8207, 2009 WL 612490 at \*5 (S.D.N.Y. Feb. 25, 2009) for its argument that an agency is irrevocable, even if not coupled with an interest, if there is consideration. In *Ravallo,* the agent was appointed to represent multiple sellers of a business in order to represent their interests in dealing with the proceeds of the sale of that business. The agent was himself one of the sellers and thus had his own interest in the subject of the agency. The court ruled:

> [Agent] unquestionably holds the power as Sellers' Representative for his own benefit, because he, too, is a Seller of [the business]. Therefore, in compromising claims or taking any other action in his capacity as Sellers' Representative, [agent's] own personal interests are directly affected. As articulated in Justice Marshall's holding in *Hunt,* [agent's] power as agent is coupled with a personal interest in the subject matter of the power—the sale of [the business] and the compensation received by the former owners of the company therefor.

In addition, the agency authority in *Ravallo* was also given for the benefit of a third party, the buyer of the business who was receiving title to the business and wanted to deal with only one person as the representative of the multiple sellers. The seller attempting to revoke the agent's authority had received more than four million dollars from the buyer pursuant to the contract that appointed the agent to represent all of the sellers. It was in this context that the concept of consideration came into play. *Id.* at \*5. However, the

court's *holding* of irrevocability did not turn on the issue of consideration. Instead, it hinged on the existence of an agency coupled with an interest. *See Ravallo* at *3 (emphasis added):

> [T]he court concludes that [agent's] agency is irrevocable *because it is a classic example of an agency coupled with an interest, or given as security—which, as a matter of law, is not revocable in the absence of language so stating.*

Courts analyzing Fairmont's consideration argument in the hotel management context have rejected the "consideration only" theory in the absence of a vested interest in the subject of the agency. Thus, as explained in *Pacific Landmark Hotel,* 19 Cal.App.4th at 626, 23 Cal. Rptr.2d 555:

> Where no specific, present property interest has been found, the courts have consistently held the agency revocable, *notwithstanding the fact that the agent gave valuable consideration,* and in spite of express declarations in the contract that it was coupled with an interest and irrevocable.

(emphasis added, internal quotations omitted).

If consideration were enough to render the agency irrevocable, such an exception would swallow the rule. Agents who paid consideration for the agency, but who had no vested interest in the subject of the agency, would be able to force their principals to keep the agents in their service after the relationship had soured. Business owners would be compelled to keep managers in charge of the businesses even if the manager had no proprietary interest in the business.

Fairmont's theory—that consideration alone, in the absence of a present, vested interest—would undermine the fundamental policy reasons underlying the general rule that a principal always has the power to revoke an agency, subject to damages if the revocation was contractually unsupportable.

### Hotel Management Contracts, the Law of Agency and Consideration

The Restatement of Agency recognizes that hotel managers are agents of the owners of the properties they operate.[13] In fact, the four leading cases on the revocability of hotel management agreements—*Woolley, Pacific Landmark, Gov't Guarantee Fund* and *Woodley Road*—are all cited with approval in the *RESTATEMENT (THIRD) OF AGENCY.*[14] The Courts in all four cases held that hotel management agreements were revocable at the will of the hotel owners notwithstanding the language to the contrary in the written agreements.

With the exception of a recent, brief order from a New York trial court which

---

**13.** *RESTATEMENT (THIRD) OF AGENCY* § 3.10, Illustration No. 3 ("P, who owns a hotel, retains A Corp. to manage it. P and A Corp. enter into an agreement providing that, in exchange for A Corp.'s management services, A Corp. will receive a commission equal to five percent of the hotel's gross revenues. The agreement also provides that the hotel shall be renamed using a trade name owned by A Corp. The agreement further provides that, in exchange for the use of A Corp.'s trade name, A Corp.'s authority shall be irrevocable by P for a period of 10 years. Two years later, P revokes. A Corp.'s actual authority is terminated. Although A Corp. may have claims against P for breach of contract, specific performance is not an available remedy. A Corp.'s continued occupancy or other possession of the hotel is not rightful as to P.")

**14.** *See RESTATEMENT (THIRD) OF AGENCY,* § 3.12, Reporter's Notes to comment b (citing *Gov't Guarantee, Woodley Road* and *Pacific Landmark* ) and (citing *Pacific Landmark* and *Woolley* ) (2006).

did not contain any reasoning but which merely concluded that a one-week status quo restraint would apply,[15] all cases involving hotel management agreements that have been called to the Court's attention have held that a hotel management agency agreement must be coupled with an interest in order to be irrevocable.

In fact, and as mentioned above, the courts in the cases submitted to the Undersigned all ruled that the hotel manager's agency relationship was revocable at the will of the owner, **despite provisions in the hotel management agreement to the contrary.** *Woodley Road Joint Venture v. ITT Sheraton Corp.,* No. A97–450, 1998 WL 1469541, *1 (U.S.D.C.D.Del. Feb. 4, 1998) ("Despite the fact that the [hotel] Management Contract contained a provision stating that the contract is irrevocable, Plaintiffs may terminate [Sheraton's] agency, although it may constitute a breach of the contract.... Consequently, the issue is whether the agency was given as security qualifying as an 'agency coupled with an interest,' which is the exception to the general rule of revocability."); *Government Guarantee Fund of the Republic of Finland v. Hyatt Corp.,* 95 F.3d 291, 300 (3d Cir.1996) ("The principal has power to revoke ... although doing so is in violation of a contract between the parties and although the authority is expressed to be irrevocable. A statement in a contract that the authority cannot be terminated by either party is effective only to create liability for its wrongful termination.") (internal citation and quotations omitted).

"The *only* exception to the rule that principals may terminate the agency rela-tionship at any time is when the authority granted to the agent is a 'power given as security.'" *Id.* (emphasis added) "This type of agency relationship is also termed 'a power coupled with an interest' or an 'agency coupled with an interest.'" *Id.* at n. 5 (citations omitted); *Pacific Landmark Hotel, Ltd. v. Marriott Hotels, Inc.,* 19 Cal.App.4th 615, 624, 23 Cal.Rptr.2d 555 (1993) ("A cardinal rule of agency law is that a principal who employs an agent always retains the power to revoke the agency. Save in the case of an agency coupled with an interest, a principal has the *power* to revoke an agent's authority at any time before the agent has completed performance.") (emphasis in original, internal citations and quotation marks omitted); *Woolley,* 227 Cal.App.3d 1520, 1529–1530 ("Save in the case of an agency coupled with an interest, a principal has the *power* to revoke an agent's authority at any time before the agent has completed performance ... Although the termination cannot be prevented by the agent, the agent's remedy for wrongful termination is damages, as in any other breach of contract action.") (emphasis in original, internal quotation marks and citations omitted).

A hotel owner's interest in the use and enjoyment of its property is so important that courts have issued injunctions requiring hotel operators/managers to cease any further acts undertaken on behalf of owners and to refrain from interfering with the owner's possession and control of the real property and business operations at the property. *See, e.g., Woolley,* 227 Cal. App.3d at 1529–30, 278 Cal.Rptr. 719.

Ignoring, for the moment, the fact that some of the facts Plaintiffs rely on to

---

**15.** *M Waikiki LLC v. Marriott Hotel Services, Inc.,* N.Y. Sup.Ct. Index No. 65147/2011 (DE# 21). Fairmont advised the Court at the hearing that the New York court never held the hearing contemplated because of a bank-ruptcy filing. Specifically, Fairmont's counsel advised that the hearing never occurred because the Waikiki hotel filed for bankruptcy and the temporary restraining order was stayed. (DE# 37, pp. 17–18).

demonstrate their alleged interest in the agency are involvements flowing from a separate entity, it is certainly true that Plaintiffs have myriad involvements in the Resort other than a standard hotel management connection. The history underlying Turnberry's reacquisition of the Resort is unique and involves Fairmont and related entities. Likewise, Fairmont negotiated for contract language describing the agency as one coupled with an interest. And Fairmont's HMA provides for many contract rights, such as the right of first refusal, the right of first offer, right of quiet possession and quiet enjoyment, as well as other contingent rights under the Strategic Alliance Agreement.

Analyzed *individually,* these rights and circumstances do not provide Fairmont with an agency coupled with an interest. And Fairmont has not advanced the argument that the Court should evaluate its interests *collectively* and determine that the sum is greater than the whole of its parts. But even if Fairmont had, the Court is not aware of any authority supporting the conclusion that an agent who holds multiple contractual rights in a hotel it manages has an agency coupled with an interest because of the sheer volume of those rights and other circumstances, each of which is individually *inadequate* to create a vested, current "interest," somehow group together to cumulatively reach the requisite goal.

Although it is *possible* that a Court might adopt that argument, and although this Court is not prepared to reject outright such a notion (even though Plaintiffs never urged it themselves) as patently illogical, the mere chance that the cumulative effect theory might prevail is insufficient to generate the all-important conclusion that Plaintiffs are likely to prevail on the merits.

### Enforceability of Personal Service Contracts by Injunction or Specific Performance

Assuming that Plaintiffs *could* demonstrate likelihood of success on the merits and sufficiently establish that Fairmont has an irrevocable agency coupled with an interest in the Turnberry Resort (which they cannot),[16] their requested injunction would *still* clash head on with the well-established rule that personal service contracts are not specifically enforceable. New York law, which governs, is no exception to this principle.

 "Under New York law, a court will not compel the specific performance of a personal service contract." *In re Mitch-*

---

**16.** Fairmont entered into the HMA concerning the Turnberry Resort several years after the opinions in the four leading hotel management cases discussed above. Not only were those cases discussed in the RESTATEMENT (THIRD) OF AGENCY, but leading treatises and periodicals in the hotel management industry also discussed them. *See The Agency Challenge: How Wooley, Woodley and Other Cases Rearranged the Hotel–Management Landscape,* CORNELL HOTEL AND RESTAURANT ADMINISTRATION QUARTERLY, Vol. 44, No. 3 (June 2003) at 58–59 ("Because of cases such as *Woolley, Pacific Landmark v. Marriott, Government Guarantee Fund v. Hyatt,* and *Woodley Road v. Sheraton,* it is now common knowledge among owners, institutional investors, lenders, asset managers, and operators that the relationship between owner and manager is much more than an arms-length contractual arrangement ... Under a hotel–management contract, the owner is the principal and the manager is the agent ... Another critical element of the relationship is the power of the owner or the operator to terminate the relationship between them— with or without cause.").

No party here disputes that Fairmont is a sophisticated entity. The negotiations leading up to the HMA with Turnberry lasted for several months. Fairmont and/or its contract attorneys either knew about or should have known about the cases which "rearranged the hotel–management landscape."

*ell,* 249 B.R. 55, 59 (Bankr.S.D.N.Y.2000). Hotel management agreements are personal services contracts. *Woolley,* 227 Cal. App.3d at 1533–1535, 278 Cal.Rptr. 719 (reversing preliminary injunction reinstating hotel manager because, in addition to the agency not being coupled with an interest, personal service contracts cannot be enforced by specific performance or injunction). In *Woolley,* the hotel management contracts called "for the rendition of services which require[d] the exercise of special skill and judgment ... managerial services [that were] wide-ranging and involve daily discretionary activities ... [including] hiring and firing managerial personnel and hundreds of other employees, contracting for ... services" and the like. *Id.* at 1534, 278 Cal.Rptr. 719. Fairmont's contract to manage Turnberry's hotel provides for exactly the same type of personal services. HMA, pp. 12–13, § 3.1 (DE# 9, pp. 34–35). *See also Burger King Corp. v. Agad,* 911 F.Supp. 1499, 1506–1507 (S.D.Fla.1995) (under Florida law corporate franchise agreements are considered personal services contracts; thus they " 'are not subject to a suit for specific performance.' " As such, the district court for the Southern District of Florida concluded that it "may not order parties to continue the performance of a franchise relationship.").

In response, Fairmont argues that the HMA specifically authorizes specific performance and that Turnberry's position would mean that "a century of authority regarding irrevocable agencies" would be "trump[ed]" by "general rules concerning personal service contracts." (DE# 48, p. 15, n.14). But the mere fact an agency contract (in general) can be specifically enforced if coupled with an interest does not necessarily mean that the special type of agency contract here—a personal services contract—is specifically enforceable. Fairmont does not cite any case which

specifically holds that **personal service** contracts are specifically enforceable. And it certainly does not cite any hotel industry cases for that proposition. And, as noted, Turnberry's authority includes those involving hotel management agreements—which *are* personal service contracts—and where the courts found the agreements are not specifically enforceable.

In *Woolley,* for example, the manager of nine hotels sought an injunction preventing the hotels' owner from terminating the hotel management contracts pending resolution of an arbitration to determine whether the manager breached the contracts. In reversing the injunction obtained by the hotel manager, the appellate court branded the injunction as "fundamental[ly] flaw[ed]" because "an injunction cannot be granted to prevent the breach of a contract which cannot be specifically enforced." 227 Cal.App.3d at 1523, 278 Cal. Rptr. 719

Fairmont does not challenge the notion that a hotel management contract is, in fact, a personal services type of contract. Instead, Fairmont, in effect, objects to the rule itself and challenges the basic legal principle that personal service contracts are not specifically enforceable. Fairmont is asking the Court to jettison the standard, well-established rule and substitute one authorizing specific performance whenever a *hotel management* type of personal service contract is at is issue. The Court knows of no authority which would permit this. In fact, the public policy reasons underlying this rule are so strong that the "no-specific-performance-of-personal-service-contracts" rule has been codified in some states.

Given the undisputed fact that an HMA is a personal service contract and given that courts cannot order specific perform-

ance of personal service contracts, Fairmont has not adequately explained how or why its requested injunction (compelling Turnberry to accept Fairmont as its reinstated Resort manager pending resolution of the arbitration) is not be precluded.

As noted by the appellate court in *Woolley* when rejecting the arguments advanced by the manager of nine hotels, "there are a variety of reasons why courts are loathe to order specific performance of personal service contracts. Such an order would impose on the court the prodigious if not impossible task of passing judgment on the quality of the performance ... Courts wish to avoid the friction and social costs which would result when the parties are reunited in a relationship that has already failed, especially where the services involve mutual confidence and the exercise of discretionary authority ... Finally, it is impractical to require judicial oversight of a contract which calls for special knowledge, skill or ability." *Woolley,* 227 Cal.App.3d at 1533–34, 278 Cal.Rptr. 719 (internal citations omitted).

Likewise, the United States Court of Appeals for the Third Circuit, in *Government Guarantee,* affirmed the district court's holding that "the management agreement was a personal services contract which cannot be specifically enforced" and its explanation that "it would be inappropriate to order specific performance of the management agreement." 95 F.3d at 303.

Thus, Plaintiffs cannot meet their burden of establishing that there is a substantial likelihood of prevailing on the merits of their claim for specific performance of Fairmont's agency contract for two reasons. First, Fairmont's agency is not coupled with an interest and it is therefore not

likely to succeed on the merits. On this basis alone, Plaintiffs' motion for a preliminary injunction should be denied. *Haitian Refugee Center, Inc. v. Christopher,* 43 F.3d 1431, 1432 (11th Cir.1995). Second, the HMA is a personal services contract and personal services contracts not enforceable by injunction or specific performance

### D. *Irreparable Harm*

■ As a separate and independent requisite to obtaining a preliminary injunction, the moving party must establish that irreparable injury will be suffered unless the injunction issues. *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir.2000). The moving party must make a "clear showing" of "substantial," "actual and imminent" irreparable harm, as opposed to "a merely conjectural or hypothetical—threat of future injury." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Siegel,* 234 F.3d at 1176–77.

The "basis for injunctive relief in the federal courts has always been irreparable harms and inadequacy of legal remedies." *Sampson v. Murray,* 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). A showing of irreparable harm is "the *sine qua non* of injunctive relief." *Frejlach v. Butler,* 573 F.2d 1026, 1027 (8th Cir.1978).[17]

Plaintiffs claim that Fairmont will be irreparably harmed in several ways. Each is discussed below in the context of the evidence presented during the hearing.

#### Guest Confusion

Plaintiffs claim that Fairmont will suffer irreparable harm because Fairmont guests, including large groups, who made reservations weeks and months in advance,

---

**17.** The Eleventh Circuit cited *Frejlach* with approval for this fundamental rule in *Northeastern Florida Chapter of Ass'n of General* *Contractors v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir.1990).

will arrive at the hotel expecting it to be a Fairmont property and will be confused when Fairmont is not operating the Resort. But Fairmont presented no evidence of any instance in which that actually happened. To the contrary, both Fairmont and Turnberry presented evidence that they quickly undertook efforts to eliminate the risk of such confusion.

On the Fairmont side, Mr. Cahill, Fairmont's Chief Operating Officer, testified that Fairmont had notified guests and groups with reservations, and Fairmont President's Club Members who have reservations, that Fairmont was not managing the Hotel because of a dispute with the owner. On the Turnberry side, Mr. Rohm testified that upon the guests' arrival on August 28, 2011, they were notified at check-in of the change in management. Mr. Rohm testified that beginning on that same day, he and the staff removed all of the Fairmont logos on the thousands of items in and around the Hotel. Mr. Rohm testified that Turnberry then sent more than 3,000 letters to guests, future guests, conference groups with reservations, Fairmont's President's Club members, and social event guests with reservations informing them that the hotel was no longer affiliated with the Fairmont brand and that the hotel had changed its name to the Turnberry Isle Miami. Mr. Rohm further testified that Turnberry created a new hotel website, changed the reservation booking systems to Turnberry, and notified travel agents, wholesalers and global distribution systems of the change in management. And, finally, Mr. Rohm testified

that Turnberry issued a press release on August 28th notifying the public of the change, which was picked up by the newspapers, including *The Miami Herald.*[18]

Based on the evidence, the Court finds that Fairmont has not proven that there is a significant risk that guests will arrive at the hotel expecting it to be a Fairmont, and therefore Plaintiffs have not established that Fairmont is suffering, or will suffer, irreparable harm from the asserted confusion.

*Fairmont's Reputation With Its Guests*

■ Plaintiffs claim that Fairmont's reputation for integrity and performance, including its relationship with guests (many of whom reserve rooms on the basis of Fairmont's brand name and management of the resort), will be irreparably harmed. But Plaintiffs presented no **evidence** of any actual or imminent harm. And in light of the evidence that guests and potential guests have been notified by both Fairmont and Turnberry of the change in management, it is unlikely that any guest will be confused into thinking that they are staying at a Fairmont (thereby affecting Fairmont's reputation for integrity and performance).[19]

Moreover, Plaintiffs have failed to establish there has been or will be any deterioration in the quality of the hotel, or in the guest experience. Mr. Cahill conceded that the approximately 600 employees who are currently working at the hotel are the very same people who were hired, recruited, and trained under the Fairmont um-

---

**18.** The press release was succinct and objective and did not contain any criticism or derogatory remarks about Fairmont.

**19.** Mr. Rohm testified that the Turnberry Hotel Group is a seasoned manager since 1978 that successfully manages a number of other hotels and properties. He further testified

that Turnberry has implemented various enhancements to the hotel's management and operations. Turnberry has also completed certain physical improvements to the hotel, including new front landscaping, hardscape repairs, and general hotel deferred maintenance.

brella and that all of these employees were and are Turnberry's employees.

Mr. Lattin, Turnberry's expert, a 40–year veteran of, and a consultant to, the hotel industry, testified that he was a guest at the hotel during the two days before the September 9, 2011 evidentiary hearing. He found the hotel to be a luxury resort, comparable to any Four or Five Star hotel. Mr. Lattin testified that the staff was friendly, the food in both restaurants was good and he had a favorable overall experience.

Based on the lack of evidence concerning alleged confusion and evidence that the Hotel is either maintaining or improving its quality, the Court finds that Fairmont has not sufficiently established that its reputation with its guests for integrity and performance will somehow be harmed. In fact, Mr. Cahill testified that to the extent that there were any confusion, if a guest did have a **better** experience at the Resort while somehow confused about which entity operated it, it is possible that Fairmont could **benefit** from any such confusion.

### Fairmont's Reputation With Its Stakeholders

Plaintiffs claim that Fairmont's termination is adversely affecting its reputation with its meeting planners, guests, travel agents, tour operators, employees, existing hotel owners, prospective hotel owners, and Fairmont's many business partners around the globe. Fairmont presented one specific instance in which it claims this has actually happened. Specifically, Fairmont pointed to its business relationship with the MassMutual Insurance Company, which reserved rooms through an intermediary, for a large conference to be held at the Hotel in 2013. Mr. Cahill testified that MassMutual is "livid" with Fairmont over the change in management. Mr. Cahill testified that MassMutual did not book the property because it was a Turnberry-run resort; MassMutual booked the property because it was a Fairmont Resort.

Mr. Cahill testified that there was no written complaint from MassMutual. However, MassMutual has since written to Turnberry representatives, stating its appreciation for Turnberry's "candid feedback on the recent change in hotel assignment, as well as hearing about your mission and vision, and the many positive enhancements that are being made to the resort." (E-mail from MassMutual representative to Turnberry representative, 9/13/11, DE# 40, p. 113). MassMutual also acknowledged receipt of Turnberry's confirmation that its "contract will be honored," and MassMutual stated that it was "comfortable" holding its conference "at the Turnberry Isle Miami Resort, as planned." *Id.* Therefore, it appears as though Fairmont's reputation and relationship with Mass Mutual—the only stakeholder about which Fairmont was able to provide any concrete details in this regard—has not been irreparably harmed.

Although Fairmont voiced its concern over the prospect that other bookings will be canceled or somehow undermined or adversely affected, Mr. Rohm's testimony undercut these vague concerns. Of the 125 convention groups with reservations through 2013, all were notified of the change in management, and all but one reconfirmed their reservations without the Fairmont brand. Of the 26 social group reservations (such as wedding events), all 26 re-confirmed their reservations without the Fairmont brand. And, similarly, of the 30 corporate contracts, all re-confirmed without the Fairmont brand. (Def's Ex. 32).

Such evidence supports Turnberry's contention that the location, the staffing,

and the other amenities of the hotel are the true draw to the hotel, not the Fairmont brand. Fairmont's contrary argument—that its brand is critical and that its guests will not stay at the Turnberry Resort and might not even stay at other Fairmont resorts throughout the world—is speculative and was not supported by competent evidence. Thus, there is not a substantial likelihood that Fairmont's reputation with its stakeholders is being, or will be, irreparably harmed.

In any event, damages from the loss of MassMutual, or any other guest, would have been calculable, and therefore would not generate the requisite irreparable harm necessary for injunctive relief. Fairmont was to receive a base management fee of 3% of gross revenue, plus an incentive fee of 7% of gross operating profit, such that the loss of the revenue from a MassMutual cancellation, had there been one, would be determinable. Even Mr. Cahill conceded that the base fees and incentive fees would be calculable.[20]

Turnberry also elicited other evidence to show that Fairmont's loss of the brand on the one hotel would not irreparably harm Fairmont's reputation with its stakeholders. Mr. Lattin testified that Fairmont is a well-established, mature, quality hotel chain with critical mass. The Turnberry Resort represented only 1.5% of the entire Fairmont system. The loss of a single hotel in a mature brand that has a critical mass would cause no irreparable harm, according to Mr. Lattin's opinion. Mr. Lattin highlighted the fact that Fairmont has been in business for about 100 years and that during 92 of those 100 years Fairmont did not have a hotel in Florida,

yet the Fairmont brand survived and grew.

Mr. Lattin testified that **all** brands lose hotels: that is a part of doing business. Mr. Lattin opined that when a brand in the luxury field loses a hotel, the brand is not only unharmed, but it typically **increases** its subsequent growth. Mr. Lattin identified various examples of empirical data concerning luxury brands losing hotels and then later not only replacing the hotel but also adding others.

Mr. Lattin did not commit to a specific, definitive reason why this was the case. His point was that, regardless of whether the loss of a luxury hotel property generates a "wakeup call," spurring a hotel management company into more-efficient, growth-orientated behavior or whether it generates additional scrutiny (which might lead to changes in business strategy), the evidence is that the loss of a property often seems to correlate with growth in a top-tier, luxury hotel management chain.

Plaintiffs' evidence is not inconsistent with Mr. Lattin's testimony. Plaintiffs' expert, Mr. Berman, testified that he is not aware of any luxury brand that has gone out of business because it lost a single hotel. In addition, Thomas Storey, Fairmont's Executive Vice President for Business Strategy, testified that Fairmont has 67 hotels and that he *does not know* whether the loss of a single hotel would put Fairmont out of business.

Mr. Lattin testified also that there is no support for the notion that a loyal Fairmont guest who frequents, for example, the Fairmont in San Francisco or The Fairmont Pierre in New York, would no longer go to those hotels because Fair-

---

**20.** In *Woolley*, the appellate court explained that "a calculation of Embassy's monetary loss in the event of wrong termination was not shown to be incapable of ascertainment." 227 Cal.App.3d at 1535, 278 Cal.Rptr. 719.

mont lost the Turnberry resort hotel in Aventura, Florida.

Plaintiffs also argue that if Fairmont is not reinstated, it will lose its sole presence in the Florida market, which would damage Fairmont's brand. Fairmont also contends that the HMA contains a radius clause that precludes Fairmont from managing other opportunities in the subject market. But that ignores that with the termination of its agency to manage the Turnberry hotel, Fairmont has no such restriction. Additionally, key parts of the radius restriction **expired** well before Fairmont's agency was revoked and even before it expired it was limited in scope. HMA § 20.20 (DE# 9–1, p. 20).

As briefly referred to earlier in this Report, Plaintiffs also overlook that any loss of Fairmont's profits in South Florida are compensable in money damages—Fairmont's profits from Turnberry's South Florida hotel are calculable. Further, Mr. Lattin testified that, according to the empirical data, Fairmont has other potential hotels in the South Florida market that could be pursued for its brand. Mr. Lattin identified 55 different potential opportunities, 28 of which are independent hotels. Those potential opportunities do not include any properties that are in the development process.

Fairmont's focus on the loss of its only South Florida property glosses over the fact that its loyal guests seemed to visit other Fairmont properties throughout the world, notwithstanding the absence of one in South Florida. Fairmont simply did not introduce evidence to prove that its guests did not book rooms or vacations elsewhere because they were upset with, or concerned over, Fairmont's lack of a South Florida resort.

Based on the above evidence, the Court finds that Fairmont has not met its burden

of establishing that its reputation with its stakeholders will be irreparably harmed.

*Havoc In The Industry*

■ Plaintiffs contend that if Fairmont is not reinstated as Turnberry's hotel manager, it will wreak havoc in the hotel industry, sending a message to owners that they can rip up their hotel management agreements with their operators.

Plaintiffs presented no evidence of this specific event actually happening or distinguished this supposed threat from what occurred in the seemingly similar series of reported cases ruling that hotel owners have the at-will power to revoke agency relationships (with such well-known hotel brands as Hyatt, Marriott, Sheraton and Embassy Suites) created by hotel management agreements if the agency is not coupled with an interest.

In fact, Fairmont knowingly entered into this HMA years after courts deemed similar HMAs to be at-will agency relationships which could be revoked in the face of contrary contract language if not coupled with an interest and which could not be specifically enforced in any event. Given the existence of those cases and the widespread discussion of their consequences in the luxury hotel industry trade, it seems that any havoc would have *already* been created. But Fairmont and other luxury hotel brands continue to enter into HMAs, and Fairmont has not presented any evidence to demonstrate that this "rearrangement of the hotel-management landscape" has already created havoc or explained the additional new industry threat created by an order denying the requested preliminary injunction. It has also not presented evidence to explain why, if those previous cases did not wreak the feared havoc, the termination of this specific HMA (at a golf resort in Aventura) would suddenly and uniquely generate

these consequences.[21]

Turnberry's expert, Mr. Lattin, testified that there will be no such ripple effect because the Turnberry/Fairmont situation is unique. In most cases, the owners of luxury hotels are not in the hotel management business. Instead, they are investors. They do not have the ability to operate/manage a high-end hotel. The Turnberry/Fairmont situation is unique because Turnberry is itself a successful hotel operator and, in fact, previously operated the exact same hotel, long before Fairmont was involved.

If a hotel owner were to rip up its long-term agreement with its operator without a contractual basis, then the owner would owe the operator damages. Depending on the nature of the hotel and the duration of the HMA, these damages could be substantial. Fairmont has not submitted evidence that any significant number of owners would be financially able or willing to rip up their contracts and pay millions of dollars in damages.

Moreover, it seems unlikely that an owner would be able to form a contract with an experienced, competent new operator if the owner just "ripped up" its contract with the old operator. Hotel operators like Fairmont are typically sophisticated in the business, with numerous contracts all over the country (and often the world). If, hypothetically, an owner wanted to terminate its existing operator and then use a potential new operator to oust the existing operator, such conduct would likely be widely discussed in the industry, creating the possibility of retribution against the owner.

Based on the above evidence, the Court finds that Fairmont has not sufficiently proven its theory that industry havoc would follow if Fairmont were not reinstated.

### Proprietary Information

■ Fairmont contends that it is being irreparably harmed because Turnberry is using its proprietary, confidential information to run the Hotel. Fairmont presented no evidence of any actual use of its proprietary information.

Turnberry denied that it has used, or will use, any of Fairmont's proprietary information. Mr. Rohm testified that the Turnberry Hotel Group has been managing hotels since 1978 and has its *own* proprietary materials to manage its assets. Mr. Rohm testified that he packed up 11 boxes of Fairmont's proprietary information and shipped it to Fairmont. On September 8, 2011, Fairmont identified additional materials which it asserted were proprietary, which Turnberry brought to the September 9, 2011 hearing for delivery to Fairmont. Moreover, Fairmont has not challenged Turnberry's position that Turnberry owns the customer lists. Plaintiffs offered no evidence that any of these statements were false or provided any examples of the unauthorized use of their proprietary information. The only evidence before the Court, therefore, is that Turnberry has not and does not intend to use this information.

Based on the evidence, the Court finds that Fairmont has not demonstrated a significant risk that any of Fairmont's proprietary information is being used by Turnberry—and therefore Fairmont has

---

**21.** In a similar vein, Fairmont did not explain why other steps, such as requiring the principals of a hotel owner to sign a guaranty or to post collateral to secure a damages claim if it exercised its at-will right to terminate the hotel operator, could be taken to make hotel management companies more comfortable with an HMA arrangement which could be terminated at will and which could not be specifically enforced. This begs the question of whether the supposed havoc could easily be avoided with better planning.

not established that it is suffering, or will suffer, irreparable harm.

### Damages

 Inherent in the principal's power to terminate the agency relationship at will is that the agent is limited to a claim for monetary damages. *Wilson Sullivan Co., Inc.*, 307 N.Y. at 23, 119 N.E.2d 573; *G.K. Alan Assoc.*, 840 N.Y.S.2d at 385.

 The ability of a plaintiff to recover money damages as an adequate remedy for losses suffered precludes a finding of irreparable harm. *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 917 (2d Cir.1986) (arising out of New York). The *Loveridge* court stated:

> It is well established that 'irreparable injury means injury for which a monetary award cannot be adequate compensation.' Likewise, where money damages are adequate compensation, a preliminary injunction will not issue since equity should not intervene where there is an adequate remedy at law.

*Id.* (citations omitted)

The HMA contains a liquidated damages clause for wrongful termination. By contract, those damages are to compensate Fairmont for damage—including "harm to [Fairmont's] reputation, loss of goodwill ... and loss of a hotel with strategic significance to [Fairmont's] system." HMA, p. 50 § 16.9 (D.E. 9–1, p. 6). The clause provides for Fairmont "to receive a termination fee" in the event of a wrongful termination, setting forth a formula to determine that fee based upon the years remaining under the contract "including all Extension Terms. . . ." *Id.*

 But even if the liquidated damages provision were determined to be an unenforceable penalty, damages are calculable. Fairmont can seek its actual damages for breach of contract, as it does in its Amended Complaint. (Pltfs' Am. Compl., DE# 11, pp. 9–11). Under New York law "an established long-term course of dealings between the parties, demonstrable profit margins, and a verifiable pricing structure permits lost profits to be calculated with reasonable certainty." *Travellers Int'l, A.G. v. Trans World Airlines*, 41 F.3d 1570, 1579 (2d Cir.1994).[22] Moreover, under New York law "[d]amages resulting from the loss of future profits are often an approximation. The law does not require that they be determined with mathematical precision. It requires only that damages be capable of measurement based upon known reliable factors without undue speculation. . . ." *Ashland Mgmt., Inc. v. Janien*, 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (N.Y.App.1993).

Fairmont has managed the Hotel for at least five years and has a clear track record of its revenues and expenses in connection with its management. Just as in *Woolley, supra*, "the fee percentage" that Fairmont was to receive "is spelled out in the" HMA, and the HMA "has a specified number of remaining years and" Fairmont "has a track record on each of the hotels it has managed." *Woolley*, 227 Cal.App.3d at 1535, 278 Cal.Rptr. 719. Furthermore, damages for loss of reputation are measurable and compensable by money damages under New York law. *Schneider v. Green*,

---

**22.** An injunction was entered maintaining performance of the contract because "Travellers demonstrated that it will not be able to continue as an ongoing concern at this time if the Contract, representing 90–95% of its business is terminated," and "destruction of a business ... constitutes irreparable injury. . . ." *Travellers Int'l AG v. TWA, Inc.*, 722 F.Supp. 1087, 1104 (S.D.N.Y.1989). There was no issue in the case about a principal's power to terminate an agent at will.

No. 88 CIV 2931(MJL), 1990 WL 151142, *16 (S.D.N.Y. Oct. 1, 1990) (plaintiff "is entitled to recover $15,000 for damage to his reputation which can in part be measured by the loss of repeat sales, loss of reserved sales and slower sales"); *Block v. Block*, 258 A.D.2d 324, 685 N.Y.S.2d 443, 445 (1999).[23]

Notably, Fairmont uses these same metrics for its own calculations. Mr. Cahill testified that Fairmont's assets consist of its hotel management agreements and its goodwill, both of which have actual dollar values on Fairmont's own balance sheets. Presumably, these values are relied on by Fairmont, its investors, and its lenders.[24] Fairmont has not presented evidence that its lenders and investors do not review and consider these values, though Mr. Cahill did suggest that the figures might not be carried at their actual value.

Fairmont contends that damages will be difficult to ascertain and that the loss of goodwill is the type of damage which is vague, thereby meeting the irreparable harm standard. But "conjecture about a possibility of difficulties with damage computations is inadequate to support an injunction before trial." *Northeastern*

*Florida Chapter of the Assoc. of General Contractors v. City of Jacksonville, Florida*, 896 F.2d 1283, 1286 (11th Cir.1990). Phrased differently, "that difficult damages calculations 'may' occur is not enough." *Id.* at 1286 (reversing injunction prohibiting enforcement of ordinance pending resolution of full trial).

*Purported Inability to Pay Damages*

■ Fairmont suggests another reason supporting its irreparable harm argument: it notes that Turnberry is a single purpose entity and "the evidence **suggests** Turnberry may not have the resources to pay such an amount of damages." (DE# 48, pp. 30–31) (emphasis added). Fairmont pointed to its history with Turnberry as one fact generating its concern over Turnberry's ability to pay a liquidated damages award, which it predicts "may exceed $30 million." Fairmont cites an Iowa district court opinion as authority for its position that the Court can consider a defendant's financial situation when assessing a claim of irreparable harm.[25]

But these concerns are speculative and, even if supported by some specific evidence, are typically inadequate to create the necessary irreparable harm.[26] *See*

---

**23.** In *Woolley,* the appellate court explained that "the loss to Embassy's reputation as a result of its wrongful termination might be difficult to measure, [but] the subject could be adequately addressed through expert testimony." 227 Cal.App.3d at 1535, 278 Cal.Rptr. 719.

**24.** Mr. Cahill testified that the HMA here has a calculated value on Fairmont's balance sheet of about $30 million. Even if the Court were to find that Fairmont's reputation may be harmed, such damages are nevertheless calculable.

**25.** *ISU Veterinary Services Corp. v. Reimer,* 779 F.Supp.2d 970, 983 (S.D.Iowa 2011) (noting that defendants testified that they took out a large amount of debt to fund their new business and will be forced to file for bankruptcy if an injunction were to be granted and

concluding that "it is reasonable to conclude they are largely judgment-proof" and that a legal remedy in Plaintiff's favor would be "inadequate").

**26.** Fairmont did not introduce any evidence that Turnberry is on the verge of filing for bankruptcy protection or is currently experiencing financial difficulty, and it certainly did not provide evidence that Turnberry was engaged in concealing or dissipating assets. Instead, it referred to the prior arbitration, when Turnberry had not timely paid fees under the HMA. That arbitration was resolved and Fairmont did not allege non-payment of fees during the years since the arbitration ended.

*Fluor Daniel Argentina, Inc. v. ANZ Bank,* 13 F.Supp.2d 562, 564 (S.D.N.Y. 1998) (Plaintiff's contention that "it is highly unlikely that [defendant] will have assets which [plaintiff] can reach to satisfy any final judgment it may obtain in its favor" rejected because "[m]onetary loss alone will generally not amount to irreparable harm," and in unusual circumstances where insolvency threatens to frustrate a damage award, "conclusory assertions of a defendant's financial weakness do not demonstrate a likelihood of such harm.") (internal quotations marks omitted); *accord, International Schools Servs., Inc. v. AAUG, Ins. Co.,* No. 10–62115, 2010 WL 4810847, *6 (S.D.Fla. Nov. 19, 2010). *Cf. Jameson v. Pine Hill Dev., LLC,* No. 07–0111–WSB, 2007 WL 623807, at *5 (S.D.Ala. Feb. 23, 2007) ("any suggestion that defendants are or may become unable to satisfy a monetary judgment ordering them to pay ... is so speculative that it cannot rise to the level of irreparable harm"). *See also Surplec, Inc. v. Maine Public Serv. Co., UPC,* 495 F.Supp.2d 147, 151 (D.Maine 2007) (rejecting plaintiff's contention that Defendant might not be solvent at the time of judgment and explaining that "alleging a mere possibility that a defendant might not be able to ultimately satisfy a judgment because, at the time such judgment is entered, he may not have assets is not sufficient to demonstrate irreparable injury for preliminary injunction purposes.").

Assuming that it is appropriate to even "consider" the argument that Turnberry might not have assets to satisfy a money damage judgment in excess of $30 million, the Court has considered that concern and concludes that it is too nebulous and speculative to meet Fairmont's burden of establishing irreparable harm. Although Fairmont may be concerned over collectability of a money judgment should it prevail, "the **possibility** that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Northeastern Florida Chapter,* 896 F.2d at 1285 (emphasis supplied).

### *Preserving the Arbitration Remedy*

 Fairmont argues that a preliminary injunction is necessary to protect its arbitration rights and to prevent the arbitration from being relegated to an illusory remedy. It argues that arbitration would become a hollow formality if Turnberry were permitted to alter the status quo (i.e., with Fairmont managing the Resort).

However, whether the HMA was terminated according to its contractual terms is not the issue before the Court. The issue before the Court is whether the agency relationship created by the HMA was revocable at will by Turnberry *outside the terms of the contract.*

Moreover, that arbitration preservation issue has been squarely placed before this Court by Plaintiffs. Nowhere in the Complaint, Amended Complaint, or for that matter Plaintiffs' Motion, do Plaintiffs allege or assert that the preliminary injunction they seek is to enable arbitration by reinstating Fairmont as the hotel's manager.

Fairmont has not cited any cases in the hotel management arena which would support its theory. But an appellate court construing a similar HMA in the hotel management area has already *rejected* the argument that an injunction must be entered so that the owner does not circumvent the arbitration process and prevent the arbitrator's award from becoming moot. In *Woolley,* the appellate court concluded that "the possibility that an arbitration award might be rendered ineffectual is a threshold or minimum requirement for obtaining a preliminary injunction" and

does not "relieve an applicant from the burden of showing that the common law requirements for injunctive relief have been satisfied." 227 Cal.App.3d at 1528, 278 Cal.Rptr. 719.

\* \* \* \* \* \*

For all the reasons above, Plaintiffs have not established that Fairmont will suffer irreparable injury unless this Court issues an injunction mandating that Fairmont be reinstated as the manager of the Turnberry hotel and resort. On this basis alone, Plaintiffs' Motion for Preliminary Injunctive Relief should be denied.

### E. Balancing of Injuries

▆ Plaintiffs must also establish that unless the preliminary injunction is issued and Fairmont is reinstated as manager of Turnberry's hotel, the threatened injury to Fairmont would outweigh the damage to Turnberry.

If Fairmont were reinstated, then Turnberry would have to suffer a mandatory personal services contract with an agent in whom Turnberry says it has lost faith. The relationship between Turnberry and Fairmont has failed. Regardless of whether Turnberry has conjured up a position of dissatisfaction with Fairmont's performance and regardless of whether it ginned up a host of purported performance issues, the significant point is that it no longer wants Fairmont as its agent to run the Resort—and this alone demonstrates that the principal-agent relationship has failed.

Furthermore, if Fairmont were reinstated as Turnberry's hotel manager, the 600 hotel employees would be back under Fairmont's management, an on-again/ off-again situation likely to cause insecurity and confusion. In addition, the thousands of guests, business groups, social groups, travel agents, and wholesalers would have to be **renotified** of the switch back, a scenario likely to cause additional insecurity and confusion.[27]

Lastly, if Fairmont were reinstated, it could jeopardize Turnberry's launch into independence. Unlike Fairmont's 100 years of maturity (and its current roster of managing almost 70 hotels), Turnberry owns and manages less than ten hotels— including this one—and Fairmont's reinstatement might impact Turnberry.[28]

On the other hand, Fairmont, a mature brand with a critical mass, will not be irreparably harmed, and damages for the termination are recoverable.[29]

### F. Public Interest

Fairmont argues that the public interest is served by a preliminary injunction requiring Turnberry to follow the terms of its HMA and to prevent it and others in the future from engaging in a dangerous

---

**27.** It is also worth noting that Fairmont's stated, albeit speculative, fear of customer and stakeholder confusion over who manages the property might actually be realized if it were reinstated and then forced to again relinquish management of the resort (if, for example, the arbitrator concluded that Turnberry had the power to oust Fairmont).

**28.** Of course, the reputation of Turnberry and its principals in the luxury hotel industry might *already* be damaged, regardless of whether the requested injunction were granted or denied. Word of Turnberry's surprise, no-notice, over-the-weekend termination of Fairmont will likely be discussed in the industry, and Turnberry's success in defeating a preliminary injunction motion may be woefully inadequate to ameliorate any potential reputational damages caused by an intentional, planned breach of the notice/cure/termination provisions of a heavily-negotiated HMA.

**29.** Indeed, if Turnberry's expert Mr. Lattin's empirical data is any indication, the ouster may actually result in the growth of Fairmont's hotel roster.

self-help measure which contract law is designed to prevent.

Turnberry, on the other hand, says that the public interest is served by an order (denying the requested preliminary injunction) which upholds a principal's fundamental right to terminate its agent, subject to a damages claim. It also argues that the public policy underling the general rule—i.e., a principal should not have an agent forced upon him against his will— would be undermined by a preliminary injunction.

Because the Court has already concluded that Fairmont has not met other requirements for a preliminary injunction, it need not wade into these broad, sweeping policy arguments and therefore will not now decide which of the two so-called public interests are more important.

## IV. RECOMMENDATION

For the reasons described above, the Undersigned respectfully recommends that the District Court **DENY** Plaintiffs' motion.

## V. *Objections*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(b), the parties have until Friday, September 30, 2011 to serve and file written objections, if any, with the District Court. Each party may file a response to the other party's objection by Tuesday, October 4, 2011.[30] Failure to timely file objections shall bar the parties from a de novo determination by the District Court of an issue covered in this Report and bar the parties from attacking on appeal the factual findings contained herein. *Resolution Trust Corp. v.*

---

**30.** The initial deadline is tighter than the proposed deadline the Court mentioned at the end of the evidentiary hearing. But Plaintiffs, who presumably are the parties who will file written objections, wanted the deadline for

*Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir.1993) (citing *LoConte v. Dugger*, 847 F.2d 745, 749–50 (11th Cir. 1988)).

**RESPECTFULLY RECOMMENDED,** in Chambers, in Miami, Florida, this 26th day of September, 2011.

---

the proposed report and recommendations to be Monday, September 12, 2011, following an evidentiary hearing which ended at approximately 7:00 p.m. on the previous Friday, September 9, 2011.